JERRY S. TUREM, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 944–67. Filed July 16, 1970.

Jerry S. Turem, pro se.
*Harry M. Asch,* for the respondent.

#### OPINION

RAUM, *Judge:* The Commissioner determined deficiencies in the income tax of Jerry S. and Jeanne L. Turem for the calendar years 1963 and 1964 in the amounts of $596.04 and $324.43, respectively. The only question for decision is whether amounts received by petitioner, Jerry S. Turem, during 1963 and 1964 are excludable from gross income as scholarships or fellowship grants under section 117, I.R.C. 1954. The facts have been stipulated.

Petitioner, Jerry S. Turem, and his wife, Jeanne L. Turem, filed joint Federal income tax returns for the calendar years 1963 and 1964 with the district director of internal revenue, San Francisco, Calif. The taxpayers have subsequently been divorced. The petitioner resided in Madison, Wis., when the petition in this case was filed.

Between September of 1953 and February of 1957, petitioner attended undergraduate college first at the University of North Carolina and subsequently at the University of Connecticut, majoring in psychology at each school. From February of 1960 until June of 1961, he attended San Francisco State College where he majored in liberal arts ("creative writing") and received an A.B. degree.

In October of 1961, petitioner took a job with the Department of Public Welfare of the City and County of San Francisco (the county

department) as a social worker with temporary status, and in July of 1962, he achieved permanent employee status, with the title and duties of a senior social service worker.

At that time Federal, State, and local governments were jointly involved in the funding and administration of social welfare programs in the State of California. The Federal Government provided a substantial portion of the funding for such programs, but delegated to California's State and local governments the responsibility for administering the funded programs. Under titles I, IV, X, XIV, and XVI of the Federal Social Security Act (42 U.S.C. sec. 301 *et seq.* (1964)), State governments were required to satisfy the applicable Federal requirements in order to qualify for the Federal funds available for various public-assistance programs. One such requirement was that the State submit for the approval of the Secretary of the Department of Health, Education, and Welfare (HEW) a "state plan" which met the applicable Federal requirements. See 42 U.S.C. secs. 301, 302, 601, 602, 705, 1201, 1202, 1351, 1352, 1381, 1382 (1964). Ordinarily, under its plan, a State could either directly administer the program in question and disburse public-assistance payments itself or delegate such functions to local government organizations which remained subject to its supervision. The State of California chose the latter plan.

The California Welfare and Institutions Code (Welfare Code)[1] declared the provision of social services to be "a matter of statewide concern." Accordingly, the California State Department of Social Welfare (CSDSW) was charged with the responsibility for supervising the provision of public assistance throughout the State and ensuring compliance with the applicable Federal and State regulations:

§ 10600. Supervisory agency. It is hereby declared that provision for public social services in this code is a matter of statewide concern. The department is hereby designated as the single state agency with full power to supervise every phase of the administration of the public social services for which grants-in-aid are received from the United States government or made by the state in order to secure full compliance with the applicable provisions of state and federal laws.

\*      \*      \*      \*      \*      \*      \*

§ 10603. Advice and supervision. The department shall advise public officers regarding the administration of public social services by public agencies throughout the state, and shall supervise the administration of state aid to all persons receiving or eligible to receive state aid. \* \* \*

§ 10604. Administration of funds; conditions; standards. In administering any funds appropriated or made available to the department for disbursement through the counties for welfare purposes, the department shall:

---

[1] References to the Welfare Code are to the current code section numbers, but the statutory language cited is substantially identical to that in effect after July 24, 1963. See Cal. Stats. 1963, ch. 1916, pp. 3918–3930; *id.*, 1961, ch. 1780, sec. 1, pp. 3792–3793.

(a) Require as a condition for receiving such grants-in-aid, that the county shall bear that proportion of the total expense of furnishing aid, as is fixed by the law relating to such aid.

(b) Establish regulations, not in conflict with the law fixing statewide standards for the administration of all state or federally aided public social service programs, defining and controlling the conditions under which aid may be granted or refused. All regulations established by the department shall be binding upon the boards of supervisors and the county department.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

§ 10613.　Agent of federal government. The functions of the department may include the administration and the supervision of the administration of public social services within this state as an agent of the federal government, and acting as a service agency for the federal government in the field of social service and welfare.

California county governments ultimately received Federal and State funds and disbursed them, along with county funds, in the form of public-assistance payments (Cal. Welf. & Inst'ns Code sec. 10800) :

§ 10800.　Administration as county function; establishment of county department. The administration of public social services in each of the several counties of the state is hereby declared to be a county function and responsibility and therefore rests upon the boards of supervisors in the respective counties pursuant to the applicable laws, and in the case of public social services for which federal or state funds are provided, subject to the regulations of the department.

For the purpose of providing for and carrying out this function and responsibility, the board of supervisors of each county, or other agency as may be otherwise provided by county charter, shall establish a county department, unless otherwise provided by the county charter. Except as provided herein, the county department shall be the county agency for the administration of public social services and for the promotion of public understanding of the public social services provided under this code and the problems with which they deal.

As a result, county departments served the applicants for and recipients of public assistance in California, but they remained subject to substantial bodies of Federal and State regulations regarding such matters as personnel standards, hearings, reports, records, and qualifications for aid. The relationship between State and Federal regulations and county responsibility is exemplified by the statutory provision governing personnel standards (Cal. Stats. 1963, ch. 1916, sec. 40, pp. 3927–3928, repealed *id.* 1969, ch. 1283, sec. 6, p. 2514) :

Standards.　For the purposes of the administration of state or federally supported public social services, the director [of CSDSW] shall, by regulation, establish and maintain personnel standards on a merit basis (including therein standards of qualifications, competency, education, experience, tenure and compensation) necessary for proper and efficient administration, and to assure state conformity with applicable federal requirements.

In the exercise of his functions under this section, the director shall exercise no authority with respect to the selection, tenure of office and compensation of any individual employed in accordance with such standards.

Nothing in this section shall prevent any county from establishing its own merit system and determining thereunder the personnel standards to be applicable to its employees, but as to employees engaged in administering state and federally supported public social services, such county systems and standards shall be subject to approval and review by the department.

A "state" plan under titles I, IV, X, XIV, and XVI of the Social Security Act was required to "provide such methods of administration * * * as are found by the Secretary [of HEW] to be necessary for the proper and efficient administration of the plan." 42 U.S.C. secs. 302(a)(5), 602(a)(5), 1202(a)(5), 1352(a)(5), and 1382(a)(5) (1964). In connection with these provisions, the Social Security Act authorized Federal funding of 75 percent of expenditures made for "the training of personnel employed or preparing for employment by the State agency or by the local agency administering the plan in the political subdivision." See 42 U.S.C. secs. 303(a)(4)(A)(iv), 603(a) (3)(A)(iv), 1203(a)(3)(A)(iv), 1353(a)(3)(A)(iv), and 1382 (a)(4)(A)(iv) (1964). HEW's "Handbook of Public Assistance Administration," dated October 16, 1963, stated (sec. 3250):

3250.  *Opportunities for Technical and Professional Education*

Opportunities for technical and professional education contribute to proper and efficient administration by increasing the number of adequately trained personnel to fill specified agency positions. Provision for educational leave is based on the premise that certain classes of positions require technical or professional education to insure the knowledge and skill necessary for public assistance administration and that such education should ordinarily be at the graduate level. The State agency must determine the positions that require professional or technical training in accordance with agency program objectives. If staff with the required qualifications are not available through the normal recruitment and selection devices, the agency will make available, to selected personnel within the agency or to personnel specifically recruited and appointed for training purposes, the opportunity to obtain the professional or technical training needed for assignment in such positions upon completion of the educational experience. Persons with employment status in the agency are more likely to be willing and able to fulfill their obligation upon completion of training. However, should personnel of superior capacity with employment status in the agency not be available, then persons selected to prepare for employment may be awarded training grants to obtain the training necessary to qualify them for such positions.

With regard to selection and compensation of the employees involved in educational programs, the HEW handbook stated (sec. 3251):

3251.  *Plans for Selection of Staff for Educational Grants*

An adequate payment for salary and educational expenses for employees, adequate training grants for persons preparing for employment, and a plan for systematic and objective evaluation of candidates are essential to assure the selection of persons with greatest potentiality for contributing to improvement of the agency's services following the period of study.

In March of 1962, petitioner applied to the California State Department of Social Welfare (CSDSW) for an educational stipend for

study in social work at the University of California's Berkeley campus.

Section 10907 of the Welfare Code authorized the board of supervisors of any county to—

provide educational leaves to employees under such conditions as may be prescribed in an agreement or plan entered into by this state with the federal government.

Section 10900 of the Welfare Code and the federally approved State Child Welfare and Public Assistance Staff Development Plan authorized CSDSW to grant stipends for education in social work to county welfare department employees and persons preparing for such employment. The Welfare Code declared the purpose of such grants to be (sec. 10900) :

to promote welfare personnel training in every county in this state, which will provide the quality and quantity of trained personnel required to eliminate or reduce the circumstances or conditions which impede or prevent an individual or a family from making progress toward proper social adjustment, self-support, and self-direction.

The CSDSW Manual, sec. SD–540.10 (Aug. 1, 1962), stated that the stipend program was "designed to supplement county administered educational leave programs" and that its purpose was "to enable the state to administer the public welfare programs more effectively" :

The SDSW graduate stipend program is basically designed to supplement county administered educational leave programs as provided for under W&IC Section 300.[2] Under this section, county welfare departments may grant educational leaves with pay to their permanent employees to attend an institution of learning for the purpose of improving their skills, knowledge, and techniques in the administration of social welfare programs which will benefit the departments as follows :

.1  To develop the professional and technical skills of employees to achieve proper and efficient administration of the public social services programs in the State of California.

.2  To add to the reservoir of professionally trained employees required to staff the expanding public social services and programs.

.3  To provide incentive and motivation in the form of financial help to experienced employees engaged in the administration of public welfare programs who have shown ability and aptitude to profit from professional education, and to attract and prepare other eligible persons, for professional employment in the administration of the public assistance and child welfare programs. Since completion of the professional social work curriculum requires two years, it is to the advantage of the agency and the employee that upon satisfactory completion of the first year of graduate education, the employee be granted another educational leave to enable him to qualify for a second year State Department of Social Welfare stipend.

---

[2] Sec. 300 is identical to current Welfare Code sec. 10907.

The manual also set forth the criteria and method of selection (sec. SD–540.50) :

.3 *Criteria for Selection*—The selection of applicants will be made by the SDSW in cooperation with the county welfare departments, and the graduate schools of social work. Consideration will be given to :

.31 The professional staff needs of county welfare departments in the administration of public social service programs. (Each year the SDSW will publish a list of counties in which students (noncounty employees) may secure employment to fulfill their employment commitment under the education stipend plan.)

According to the manual, the stipends for graduate education were granted to both permanent county welfare department employees and "persons preparing for employment" who were college graduates, who were admitted to a first- or second-year program in an accredited graduate school of social work, and who resided in California. The manual (sec. SD–540.30.1) further stated that employees on educational leave were required to "sign a legally binding agreement to return to the agency granting such leave and accept employment in a professional capacity in the administration of the public welfare programs." [3]

On his application form for the stipend, petitioner signed a statement declaring that he was familiar with the conditions under which stipends were granted and that if he were awarded a stipend, he would sign an agreement with CSDSW assenting to those conditions. The application form asked petitioner to describe the kind of public-assistance work he was interested in upon completion of his studies. Petitioner's response was, "I would be interested in working in a public welfare agency in one of the categorical aid programs." The application also asked whether petitioner had been granted educational leave by a county welfare department or whether he had applied or was planning to apply for such leave. Petitioner answered that he was planning to apply for educational leave. Petitioner's application was successful, and he was awarded a $3,293 stipend for study in social work at the University of California.

Pursuant to the statement he signed in his application for the stipend, petitioner subsequently executed a form document, "Public Assistance Educational Stipend Agreement." The agreement was also

---

[3] The manual also declared (sec. SD–540.30) :

.3 Persons in preparation for employment in the public assistance or child welfare program will be required, prior to completion of their education to take a written Merit System examination, and accept employment in the appropriate public assistance or child welfare program in a professional capacity with the SDSW or in a county welfare department.

executed by the Director of Public Welfare for the County of San Francisco and by a CSDSW official, and provided as follows:

## PUBLIC ASSISTANCE EDUCATIONAL STIPEND AGREEMENT

1. This contract is made between Jerry Turem hereinafter called the Student, the State Department of Social Welfare, hereinafter called the State, and San Francisco Public Welfare Department, hereinafter called the County, as part of a Public Assistance Educational Stipend program with the purpose of increasing the number of adequately trained staff available for work in the administration of public assistance programs in this State.

2. The source of funds for providing these stipends are State-Federal administrative matching funds under Title I, IV, X, XIV, of the Social Security Act and sections 300 et seq. of the Welfare and Institutions Code. This agreement is made subject to all laws and regulations applicable to said funds.

3. This stipend is for attendance at University of California for the period beginning September 1962 and ending June 1963 to pursue a course of study in Social Work.

4. This stipend is for $2,970 which includes maintenance and allowance for dependents (plus an amount for the employee's and County's share of retirement as determined by the appropriate Retirement Board). This will be paid to the Student by the County in monthly increments in accordance with the attached stipend award notice.

5. An expense allowance of $323 is also made to include tuition, fees, transportation, books, supplies, and field work travel expenses. This amount will be advanced to the Student by the County in increments in accordance with the attached stipend award notice.

6. The Student agrees to use his best efforts to maintain a satisfactory performance while attending school pursuant to this agreement. The State may terminate a stipend after 30-days' notice if in the judgment of the State the Student's performance is unsatisfactory, or if the school determines for any reason that the Student should leave school. During such a 30-day period stipend funds will be paid; however, no expense allowance will be paid.

7. The stipend and expense allowance will terminate immediately if the Student leaves school of his own volition.

8. The Student is an employee of the County on educational assignment and agrees to continue in employment with the County in a public assistance program upon completion of training, for a period of one calendar year for each academic year of such educational assignment.

9. The student agrees to repay all amounts received pursuant to this agreement:

a. If the Student leaves school of his own volition.

b. If the Student fails to return immediately to employment as specified above on completion of the stipend course, or within such additional time as may be mutually granted by the County and State.

10. If the Student leaves employment with the County without approval of the State before completion of the agreed term of employment, he agrees to reimburse the County that portion of the total of the stipend award and expense allowance which is proportional to the uncompleted term of his employment commitment.

STATE OF CALIFORNIA,

*Department of Social Welfare*

By: R. JAMES
_____

_____
Title

_____
Date

Student: JERRY TUREM
_____
Signature

4214 CALIFORNIA, S.F.
_____
Address

8/11/62
_____
Date

County of: SAN FRANCISCO

By: [Illegible signature]
_____

*Director of Public Welfare*
_____
Title

*August 23, 1962*
_____
Date

Before beginning his graduate studies, petitioner was earning a gross salary of $493 per month as a senior social worker.

Petitioner attended the University of California at Berkeley (Berkeley) from September 1962 until June 1963. During that time he participated in the first half of a 2-year master's degree program in the school of social welfare. In early 1963 petitioner applied for a second educational stipend to complete the master's program. On his application form, he signed his name below the following statement:

I understand my commitment to accept employment in a professional capacity and to remain in such employment for one calendar year for each academic year for which the educational award is granted (Employees on educational leave from a county welfare department agree to return to the agency granting such leave: persons not currently employed by a county agree to accept employment either with the State Department of Social Welfare, or in one of the county welfare departments designated by the State Department of Social Welfare.)

The remainder of the completed form was substantially the same as petitioner's first application. His application was successful, and he was awarded a $3,586.50 stipend (nearly $300 larger than the previous year's stipend). Petitioner again executed a "Stipend Agreement," substantially identical to the form he had signed a year earlier.

In total, petitioner studied at Berkeley for two 9-month periods, September 1962 to June 1963, and September 1963 to June 1964, and at the end of the second academic year, he received a master's degree in social welfare. While studying at Berkeley, petitioner maintained his status as an employee of the county department and was granted educational leave for each of the 9-month academic years.[4] However, with

---

[4] From June through September of 1963, while on summer vacation between his 2 years of study, petitioner was employed by the county department as a child welfare worker at the regular salary for that position of $644 per month.

the exception of the requirement that petitioner maintain satisfactory progress toward a master's degree in social welfare in an accredited educational institution, neither CSDSW nor the county department explicitly exercised control over his curriculum or research.

The gross payments made to petitioner with respect to his 2 years of school were as follows:

*September 1962—June 1963*

| | | |
|---|---:|---:|
| Maintenance: | | |
| $330 per month for 9 months | | $2,970.00 |
| Expenses | | 323.00 |
| tuition and fees | $173.00 | |
| books and supplies | 50.00 | |
| fieldwork travel | 100.00 | |
| Total | | 3,293.00 |

*September 1963—June 1964*

| | | |
|---|---:|---:|
| Maintenance: | | |
| $360 per month for 9 month | | 3,240.00 |
| Expenses | | 346.50 |
| tuition and fees | 196.50 | |
| books and supplies | 50.00 | |
| fieldwork travel | 100.00 | |
| Total | | 3,586.50 |

The portions of the stipends allocated to "expenses" were paid by CSDSW and mailed to the petitioner in care of the University of California. The maintenance payments were made monthly by the county department and were mailed to the petitioner at his home address to arrive at his customary payday. All such payments made by the county department were reimbursed by CSDSW. Social security taxes, Federal withholding taxes, and retirement benefit and health insurance payments were deducted from the monthly maintenance payments, and for each of the years 1963 and 1964, the county department prepared withholding tax statements which included the entire amount of the maintenance payments.

In addition to the gross monthly maintenance payments described above, the county department made expenditures for certain employee benefits, such as retirement, old age, and survivors and dependents insurance, workmen's compensation, and health insurance. These expenditures by the county department were reimbursed by CSDSW. When the value of the employee benefits is added to the gross monthly maintenance payments, the monthly payments made on petitioner's behalf averaged approximately $369 for the first academic year and $407 for the second.

The educational stipends paid to petitioner were financed from funds appropriated for local staff development to the extent of 75 percent by the Federal Government and 25 percent by the State of

California. The size of the maintenance payments was determined on the basis of a policy decision to make educational stipends available to the largest number of people with the funds available, and among the factors taken into account in establishing the size of the payments were the size of similar grants made by other Government agencies and the cost of living. The parties have stipulated that "For the academic years 1963–1964 through 1968–1969, there were 1,261 graduate education stipends for study in social welfare granted to county welfare department employees and 388 of such stipends to non-employees." The maintenance payments made to social welfare employees were larger than those made to nonemployees in the hope that the employees would thereby be induced to contribute their greater experience beyond the time period required by their stipend agreements. For similar reasons, larger amounts were paid to supervisory personnel than to nonsupervisory personnel.

During his educational leave, petitioner retained his civil service classification as a senior social worker, his accrued sick leave and vacation leave, and his accrued seniority rights. Moreover, during the 2 academic years, petitioner continued to accrue seniority rights (which were applicable to such personnel actions as layoffs, promotions, and salary adjustments) and retirement benefits (consisting of payment by CSDSW into existing county retirement plans of both the county's share and the employee's share of the required monthly amount of benefits). If ill during his education leave, petitioner was entitled to receive the full amount of the educational stipend, and that right was considered the equivalent of and in lieu of the sick leave time which employees were ordinarily granted. School vacations were considered equivalent to and in lieu of the vacation time which employees customarily enjoyed. However, during the summer vacation which separated his 2 school years at Berkeley, petitioner was employed by the County Department as a child welfare worker at the normal salary for that position of $644 per month.

Pursuant to the educational stipend agreements, petitioner continued his employment with the county department upon completion of his graduate education. From July of 1964 through April of 1965, he was employed as a child welfare supervisor at a monthly salary of $710. A master's degree in social welfare was required in order to hold that position. From April of 1965 through November of that year he held the position of a senior management assistant, with a salary of $745 per month, and thereafter, until October of 1966, petitioner was employed as a data processing coordinator at $813 per month. Funds for the salaries paid to all employees in social service and child welfare

positions came from Federal, State, and local sources, while funds for the salaries paid to senior management assistants and data processing coordinators came from Federal and local sources.

Employees of the county department were within the jurisdiction of the San Francisco Civil Service Commission and were governed by a retirement plan limited in its coverage to employees of the City and County of San Francisco. The San Francisco Civil Service Commission and the retirement plan were completely autonomous of counterpart State systems governing State employees, including those of CSDSW.

In October of 1966, petitioner terminated his employment with the county department.

Petitioner filed joint returns for the taxable years 1963 and 1964 and excluded the monthly maintenance payments [5] from his gross income for each year. In his notice of deficiency the Commissioner determined that the payments were not excludable.

Section 117(a)[6] excludes from gross income any amount received "as a scholarship at an educational institution" or "as a fellowship grant." However, regulations section 1.117-4(c)[7] provides that payments representing "compensation for past, present, or future employment services" and payments made "to, or on behalf of, an individual to enable him to pursue studies or research primarily for the benefit of the grantor" are not to be considered scholarships or fellowship grants for the purpose of the exclusion authorized by section 117. These regulations have recently been upheld by the Supreme Court in *Bingler* v. *Johnson*, 394 U.S. 741. The Court stated (394 U.S. at 757-758) :

---

[5] The petitioner did not claim the "expenses" portion of the stipends as exclusions, and those payments are not here in issue.

[6] SEC. 117. SCHOLARSHIPS AND FELLOWSHIP GRANTS.

    (a) GENERAL RULE.—In the case of an individual, gross income does not include—

        (1) any amount received—

            (A) as a scholarship at an educational institution (as defined in section 151(e)(4)), or

            (B) as a fellowship grant,

    including the value of contributed services and accommodations; * * *

[7] Sec. 1.117-4 Items not considered as scholarships or fellowship grants.

The following payments or allowances shall not be considered to be amounts received as a scholarship or a fellowship grant for the purpose of section 117 :

    *       *       *       *       *       *       *

    (c) *Amounts paid as compensation for services or primarily for the benefit of the grantor.* (1) Except as provided in paragraph (a) of § 1.117-2, any amount paid or allowed to, or on behalf of, an individual to enable him to pursue studies or research, if such amount represents either compensation for past, present, or future employment services or represents payment for services which are subject to the direction or supervision of the grantor.

    (2) Any amount paid or allowed to, or on behalf of, an individual to enable him to pursue studies or research primarily for the benefit of the grantor.

The thrust of the provision dealing with compensation [sec. 1.117–4(c)] is that bargained-for payments, given only as a "*quo*" in return for the *quid* of services rendered—whether past, present, or future—should not be excludable from income as "scholarship" funds. * * *

The regulations are thus designed, at least in part, to distinguish relatively disinterested payments made primarily for the purpose of furthering the education of the recipient from payments made primarily to reward or induce the recipient's performance of services for the benefit of the payor. Cf. *Elmer L. Reese, Jr.*, 45 T.C. 407, 411, affirmed 373 F. 2d 742 (C.A. 4).

The Commissioner contends that the payments here in issue were both "compensation for * * * employment services" and payments made to enable petitioner "to pursue studies * * * primarily for the benefit of the grantor" and that therefore the payments are not excludable from petitioner's gross income. We agree.

HEW was the source of 75 percent of the maintenance payments and CSDSW was the source of the remainder. Each agency made its contribution in order to upgrade the quality of social services in California. Recipients were either county welfare department employees or persons preparing for such employment, and the payments were designed to enable them to be trained so that they could perform their duties in the future more effectively. As an applicant, petitioner was required to state the nature of the public-assistance work in which he was interested, and when accepted, petitioner was required to promise to continue in employment with a county public welfare department upon completion of his studies for a period of 1 calendar year for each academic year of study. Although petitioner's selection of courses was not formally subject to the review of any government agency, he was required to pursue studies in social work in an accredited graduate school and to maintain a satisfactory academic record there. Furthermore, since his stipends were granted on a yearly basis, his studies were subject to some supervision by virtue of the fact that at the time he applied for a second stipend, his record could have been reevaluated. Thus, it would seem that the maintenance payments were awarded in such manner as to ensure that they would benefit CSDSW and the county department. Cf. *John E. MacDonald, Jr.*, 52 T.C. 386, 392–393.

However, petitioner takes the position that the stipends cannot be considered compensation or payments made primarily for the benefit of the grantor because he has never been an employee of the grantor, CSDSW.[8] The argument is without merit. Social services in

---

[8] Petitioner does not contend that by virtue of the fact that it supplied the State with 75 percent of the funds for the payments here in issue, the Federal Government should be considered the grantor. See *Bingler* v. *Johnson*, 394 U.S. 741, 743 fn. 4; *Marjorie B. Haley*, 54 T.C. 642.

California were provided as the result of a cooperative effort by Federal, State, and county governments. Each government had an interest in providing social services, and they joined in a cooperative effort to provide them. The Federal Government offered substantial funds for use in social welfare programs to States complying with its requirements. The State of California accepted Federal funds, provided funds of its own, and assumed a supervisory role in the provision of social services throughout the State. California's county governments, however, were primarily responsible for the dispensation of social services to those in need.

The educational stipend program was a result of this joint effort. The funds, provided by Federal and State sources, were designed to supplement and enhance the educational leave programs administered by the counties and thereby improve the quality of social services in the State. While a State agency, CSDSW, selected the recipients of the stipends, it did so with the advice of the counties employing the applicants and with each applicant's assurance that he had or would apply to his county welfare department for educational leave. The joint nature of the stipend grants is further reflected by the fact that each "Stipend Agreement" signed by petitioner was also signed by representatives of both the State and the county. It is therefore clear to us that in providing social services and in granting petitioner's educational stipends, the State and the county were engaged in a joint enterprise, and that for the purposes of regulations section 1.117-4(c), they may both be viewed as employers of the petitioner and the grantors of his stipends.

The petitioner contends, however, that since the results of his education ultimately benefited the citizenry of the State, the stipends may not be considered compensation or payments made primarily for the benefit of the grantor. We disagree. The fruits of the labor of many employees are ultimately enjoyed by the public. The fact that the State and county made no economic profit as the result of petitioner's studies does not support either the conclusion that the maintenance payments should not be considered compensation or the conclusion that the payments were not made primarily for the benefit of the grantor.[9] "Benefit" in the case of a governmental agency may mean

---

[9] In *Bingler* v. *Johnson*, 394 U.S. 741, 758 fn. 32, the Supreme Court noted that:

"[32] We accept the suggestion in the Government's brief that the second paragraph of Treas. Reg. § 1.117–4(c)—which excepts from the definition of 'scholarship' any payments that are paid to an individual 'to enable him to pursue studies or research primarily for the benefit of the grantor'—is merely an adjunct to the initial "compensation" provision:

" 'By this paragraph, the Treasury has supplemented the first in order to impose tax on bargained-for arrangements that do not create an employer-employee relation, as, for example, in the case of an independent contractor. But the general idea is the

something in addition to or different from monetary gain; it may and properly should include that which may be helpful in the carrying on of relevant governmental operations. CSDSW and the county department were jointly engaged in the enterprise of providing social services. They made the maintenance payments to petitioner and others in order to advance that enterprise by increasing the number of adequately trained staff available for public-assistance work. Their objective was furthered as the result of petitioner's studies.[10] CSDSW and the county department thus made payments to petitioner in order to induce him to engage in activity beneficial to them in the conduct of their governmental functions. The payments were therefore clearly in the nature of compensation, the "*quo*" in the "*quid pro quo*" exchange to which regulations section 1.117–4(c) is addressed. See *Bingler* v. *Johnson*, 394 U.S. 741, 757.

It is also significant that during the years in issue petitioner continued to be treated as an employee. He retained his status as a county employee. The county mailed the maintenance payments at such times as they would arrive at petitioner's home on his customary payday, and it continued to deduct Federal withholding taxes from his monthly checks. The petitioner continued to participate in social security, retirement, and insurance programs and to accrue seniority rights, sick leave time, and vacation time. Although petitioner's salary fell from $493 per month to $320 per month during the first academic year and to $360 per month during the second year, his education did qualify him for a position paying $710 per month after his studies were completed, and during the summer between his 2 years of study, he was employed by the county at the rate of $644 per month.

The facts of this case are strikingly similar to those in *Marjorie E. Haley*, 54 T.C. 642. There the taxpayer, an employee of the Jackson County Public Welfare Commission in the State of Oregon, received educational leave grants from the Oregon State Public Welfare Commission to study at the University of Washington, School of Social Work. We held the grants not excludable from the taxpayer's gross income, and although the taxpayer's employment relationship to the State of Oregon in *Haley* was apparently more proximate than was

---

same: "scholarship" or "fellowship" does not include arrangements where the recipient receives money and in return provides a *quid pro quo*.' Brief for Petitioner 22."

Thus, the fact that the general public may have derived substantial benefits from the educational stipends is not inconsistent with a finding that the payments were made "primarily for the benefit of the grantor." The last-quoted phrase is designed to distinguish relatively disinterested payments made primarily for the purpose of furthering the education of the recipient from payments made as compensation for services performed for the benefit of the grantor and thus has no bearing on what use is ultimately made of the recipient's services. Cf. *Elmer L. Reese, Jr.*, 45 T.C. 407 at 411.

[10] We note in particular that as a result of his education, petitioner was able to accept a position for which he would not have qualified had he not earned a master's degree.

the petitioner's relationship to the State of California in this case, we think that the two cases should be treated identically. We conclude that the maintenance payments are not excludable from petitioner's income. See also *Stewart* v. *United States*, 363 F. 2d 355 (C.A. 6), and *Ussery* v. *United States*, 296 F. 2d 582 (C.A. 5), which were both cited with approval in *Bingler* v. *Johnson*, 394 U.S. 741, 756 fn. 30.[11]

Petitioner relies primarily on *Aileene Evans*, 34 T.C. 720, acq. 1965–1 C.B. 4, withdrawn and nonacq, substituted 1970–1 C.B. XVII. The facts of that case are distinguishable from those presented herein since there the taxpayer had not been employed by the grantor prior to the time when the payments in issue were made. In any event, the precedential value of that opinion must be considered not only in the light of the Supreme Court's subsequent opinion in *Bingler* v. *Johnson*, 394 U.S. 741, see, e.g., *id.* at 756 fn. 30, but also against the background of such later cases as *Ussery*, *Stewart*, *Haley*, and *Reese*.

*Decision will be entered for the respondent.*

---

[11] *Stewart* and *Ussery* held that educational leave grants made to employees of the Mississippi and Tennessee Department of Public Welfare were not excludable under sec. 117. We think a different result is not called for here simply because the State of California chose to organize its public assistance programs and qualify for Federal funds by delegating many administrative functions to county governments.