*Decisions will be entered under Rule 50.*

LOWELL D. WARD AND SUZANNE M. WARD, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 4050–68.   Filed November 17, 1970.

*Llewellyn H. Linde,* for the petitioners.
*Robert J. Murray,* for the respondent.

DAWSON, *Judge:* Respondent determined the following Federal income tax deficiencies against the petitioners:

| Taxable year | Deficiency |
|---|---|
| 1964 | $370.54 |
| 1965 | 242.30 |
| 1966 | 251.76 |

The only issue presented for decision is whether amounts received by petitioner Lowell D. Ward from the Minnesota Department of Public Welfare constituted a scholarship or fellowship grant excludable from his gross income under section 117.[1]

### FINDINGS OF FACT

Some of the facts have been stipulated by the parties and are found accordingly.

Lowell D. and Suzanne M. Ward are husband and wife who at the time of filing their petition in this proceeding maintained their legal

---

[1] All statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.

residence in Minneapolis, Minn. They filed timely joint Federal income tax returns for the years 1964, 1965, and 1966 with the district director of internal revenue at St. Paul, Minn. Suzanne M. Ward is a party to this proceeding solely because she filed joint returns with her husband. Thus, Lowell D. Ward shall be referred to herein as the petitioner.

Petitioner is an employee of the Department of Public Welfare for the State of Minnesota. He joined that department as a case reviewer in July 1957, and except for 2 months spent with another employer in 1959, continued in that position until 1962. In October 1962, petitioner was promoted to the position of welfare field representative. At that time he did not have a master's degree in social work. The Department of Public Welfare regarded a master's degree as a desirable qualification for its welfare field representatives.

During the taxable years 1964, 1965, and 1966 the Minnesota Department of Public Welfare, with assistance from Federal grants, had in operation a training program to aid qualified employees in obtaining additional education. The State granted leaves of absence to qualified persons and paid their tuition plus a stipend for personal living costs to enable them to pursue formal education leading to graduate degrees. The petitioner applied on May 4, 1964, for consideration under this program with the purpose of attending Florida State University to obtain a master's degree in the field of child welfare. His application was accepted.

On July 3, 1964, petitioner and the State of Minnesota executed an "academic training agreement" for the academic year of September 15, 1964, through June 15, 1965. On June 16, 1965, the same parties executed a similar agreement for the period of July 15, 1965, through April 15, 1966. Both agreements provided for the payment of $864 for tuition plus $500 per month. The earlier agreement covered a period of 10 months (tuition plus $5,000), the later agreement covered 9 months (tuition plus $4,500). Both agreements provided as follows:

The Applicant agrees to enter an accredited school and upon completion of the period of school work covered by such stipend to accept employment acceptable to the Department for a period of not less than one calendar year for each school year of education and training received under the Academic Training Program.

IT IS FURTHER AGREED BY AND BETWEEN THE PARTIES HERETO:

1. THAT this agreement may be terminated by either party upon two weeks' written notice to the other.

2. THAT in the event this agreement is terminated at the request of the Applicant or by the Department for cause, then in such case, the Applicant shall repay the Department any and all funds received by the Applicant as stipend payments under this agreement.

3. THAT failure of the Applicant to accept employment as hereinbefore set forth shall constitute a breach hereof and the stipend payments received up to the time of said breach shall be paid to the Department as liquidated damages for said breach.

Over a 10-year period the Minnesota Department of Public Welfare has granted 435 stipends. Thirty-three recipients have failed to fulfill their obligations of subsequent service. Some of these also have failed in the alternative to repay the amounts received by them. The Department of Public Welfare has never begun proceedings to recover amounts advanced to any recipient.

The Minnesota Department of Public Welfare granted petitioner a leave of absence for 1 year, beginning September 18, 1964. Section 43.22, subd. 2, Minn. Stat. Ann. (1970), provides in general that no leave of absence may exceed 1 year. Consequently, petitioner resigned his position on September 18, 1965, in order to complete his master's program. Section 43.22, subd. 4, Minn. Stat. Ann. (1970), provides that certain persons "may be reinstated within one year * * * from the expiration of an approved leave of absence * * * subject to the approval of the director of civil service." Pursuant to this provision, petitioner was reinstated to his former position as welfare field representative on April 25, 1966.

The stipend of $500 per month bore no relationship to petitioner's need or marital status, but was determined by the custom of granting recipients 75 percent of their regular salaries. Petitioner's salary had been $667 per month.

From September 1964 through April 1966 petitioner did not accrue retirement credit, vacation, or sick leave. No social security payments were made by him or for him from the stipend he received. He did not participate in salary increments or in group health and life insurance plans.

Upon his reinstatement, petitioner's seniority rights and leave time which had accrued prior to September 1964 were restored to him.

On his Federal income tax returns for 1964, 1965, and 1966 petitioner excluded from gross income the stipend and tuition payments which he received. In his notice of deficiency respondent included these amounts in income, while making allowance for the deduction of lesser amounts as educational expenses.

OPINION

Under the provisions of section 117(a), "gross income does not include any amount received as a scholarship * * * or as a fellowship grant." The terms "scholarship" and "fellowship grant" are not defined in the statute, but section 1.117-4(c), Income Tax Regs., provides that these terms do not include amounts which represent "compensation for past, present, or future employment services." Upholding this regulation in *Bingler* v. *Johnson*, 394 U.S. 741 (1969), the Supreme Court of the United States said:

The thrust of the provision dealing with compensation is that bargained-for payments, given only as a *"quo"* in return for a *quid* of services rendered—

whether past, present, or future—should not be excludable from income as "scholarship" funds.

Petitioner contends that the regulation and *Bingler* v. *Johnson, supra,* are inapplicable to this case because (1) the employment relationship between him and the State of Minnesota had been terminated, and (2) the training agreement "should be regarded as a non-legal memorandum of understanding." He relies instead upon *Aileene Evans,* 34 T.C. 720 (1960).

We do not agree that the petitioner had severed all employment connections with the Minnesota Department of Public Welfare. By definition, a leave of absence implies that the employee may be reinstated to the position which he occupied before his leave. Thus, for the first year, at least, petitioner remained an employee, to the extent that although he no longer accrued employment benefits, he did not forfeit any which he had accumulated. The second year of his absence was no different; again he could be, and was, reinstated with full benefits. After petitioner had been awarded the educational stipend, there was never any serious possibility that the director of the civil service would refuse to reinstate him. The training agreement indicates that the department expected to benefit from its investment in petitioner. See *Elmer L. Reese, Jr.,* 45 T.C. 407 (1966), affirmed per curiam 373 F. 2d 742 (C.A. 4, 1967). Even assuming that petitioner was not an employee while he attended school, we fail to see why the regulations would not apply. Section 1.117-4(c) includes "compensation for * * * future employment services." Petitioner was under a "commitment to the grantor." *Ussery* v. *United States,* 296 F. 2d 582, 587 (C.A. 5, 1961).

We do not regard the training agreement as a nonlegal memorandum of understanding. Petitioner does not suggest that the agreement to perform or repay is legally unenforceable. While it was not the practice of the Minnesota Department of Public Welfare to bring suit for enforcement, that policy could have been changed if the rate of voluntary compliance had declined.

Finally, petitioner's reliance upon *Aileene Evans, supra,* is misplaced. The Supreme Court in *Bingler* v. *Johnson,* 394 U.S. at 756 fn. 30, has cast doubt on the reasoning of that opinion. We think it is no longer sound precedent. *Jerry S. Turem,* 54 T.C. 1494, 1508 (1970).

What we have, in essence, in this case is an agreement between petitioner and his employer, whereby the employer offered to pay for petitioner's education in return for petitioner's promise of future service. Petitioner must perform, or repay the money which he received. It is a clear case of compensation for future services, a quid pro quo. Sec. 1.117-4(c), Income Tax Regs; *Bingler* v. *Johnson, supra.*

See also *Jerry S. Turem, supra; Marjorie E. Haley*, 54 T.C. 642 (1970). Reviewed by the Court.

*Decision will be entered for the respondent.*

---

TANNENWALD, *J.*, concurring: While I agree with the conclusion of the Court based upon the facts of this case, I am not so willing as the majority to consign *Aileene Evans* to precedential oblivion. I am not at all certain that the majority's conclusion with regard to *Evans* is compelled by *Bingler* v. *Johnson*. Nor is it altogether clear that funds received as an educational stipend in circumstances like those in *Evans* necessarily constitute present income.

The focal point of *Bingler* v. *Johnson* was whether a literal compliance with the limitations of section 117(b) precluded an inquiry as to the compensatory character of the payments. The Supreme Court held that such an inquiry was proper and went on to sustain respondent's regulations regarding "compensation for past, present, or future employment services" on the factual situation presented. In so doing, it described the thrust of respondent's regulations as requiring a determination "that bargained-for payments [were] given only as a '*quo*' in return for the *quid* of services rendered." See 394 U.S. 741 at 757–758.

In its opinion, the Supreme Court emphasized several factual elements which either were not, or were less directly, present in *Evans:*

(1) The preexisting employer-employee relationship, which was present both in fact and through the requirement of participation in a first phase work-study program as a necessary condition of the stipend. In this connection, the Supreme Court also noted that the employee, during the period of study, retained his seniority status and received employee benefits such as insurance and stock option privileges.

(2) The relationship of the amount of the stipend to the employee's prior salary rather than to his need.

(3) The requirement that the topical nature of the study relate to the specific activities of the employer—a factor which was far more tenuous in *Evans*.

(4) The continuity of relationship to the employer during the period of study through the submission of periodic work reports.

(5) The clear recognition, both in terms of the agreement and the substantive factual situation, that the employee should and would return to work for the particular grantor. In this connection, it should be noted that in *Evans* the taxpayer had no "obligation" to work for the Department of Mental Health of Tennessee; she could have worked for any one of a multitude of related institutions.

Additionally, I note that in *Evans* the taxpayer had the option to repay the amounts involved in lieu of satisfying her "obligation" to

render services—a circumstance that points in the direction of a loan in the year the "stipend" is received.

Many of these elements were emphasized in our opinion in *Aileene Evans*. See 34 T.C. 720, 726. Clearly, they tend to counter the inexorability of a conclusion that, in such situations, the future services are bargained for in exchange for the payments and that a sole quid pro quo relationship exists. Indeed, it is likely that the foregoing distinguishing elements caused the Supreme Court to accord less than clear treatment to our decision in *Aileene Evans*. See 394 U.S. 741, 756, fn. 30.

I am reluctant to paint with too broad a brush when it is not clear that the statute requires such sweeping generalizations. The history of our legal system teaches us that statements made in the context of particular fact situations may be perfectly unobjectionable when made but nonetheless may be inappropriate when applied to factual situations with only slight variations. While I am fully aware of our responsibilities as a national court to provide guidance for taxpayers, I am not convinced that a failure categorically to reject *Aileene Evans* is a shirking of that responsibility. Quite to the contrary, I believe that situations may exist wherein educational stipends entitled to exclusion under section 117 might be improperly taxed because of too broad a reading of the majority's opinion.

Whether the elements to which I have directed my attention would be enough to tip the scales in a taxpayer's favor is something we need not now decide. It is enough to suggest that we decide the case before us and leave the question of the extent of the continued vitality of *Ailene Evans* to be determined in light of particular factual situations as they are presented to us. The Supreme Court itself recognized in *Bingler* v. *Johnson* that a single mold should not be applied in determining what constitutes a "scholarship" or a "fellowship." See 394 U.S. 741, 753.

DRENNEN, RAUM, SCOTT, and HOYT, *JJ.*, agree with this concurring opinion.