Enrique Kaufman and Susana Kaufman v. Commissioner.
Kaufman v. Commissioner
Docket No. 1883-71.
United States Tax Court
T.C. Memo 1973-121; 1973 Tax Ct. Memo LEXIS 168; 32 T.C.M. (CCH) 525; T.C.M. (RIA) 73121; May 31, 1973, Filed *168 Scholarships and fellowships: Excludability: Resident in psychiatry. - The stipend received by a doctor who was serving a residency in psychiatry was not excludable from income as a scholarship or fellowship. The payments represented compensation for services rendered. Thomas A. Luken, 1003 First Nat'l Bank Bldg., Cincinnati, Ohio, for the petitioners. Rudolph L. Jansen, for the respondent. TIETJENS
Memorandum Findings of Fact and Opinion TIETJENS, Judge: The Commissioner determined deficiencies in the joint income tax liability of petitioners Enrique N. and Susana Kaufman for the taxable year 1969 in the amount of $901.97. The sole issue for our *169 determination is whether petitioners are entitled to a fellowship exclusion under section 117, Internal Revenue Code of 1954, [1] in the amount of $3,600 for the taxable year before us. Findings of Fact Some of the facts are stipulated and are so found. The petitioners are husband and wife and on the date of filing the petition in this case they were residents of Cincinnati, Ohio. They filed their joint Federal income tax return for the calendar year 1969 with the district director of internal revenue at Cincinnati. Susana Kaufman is a party herein only because she joined in filing the return; further reference to "petitioner" shall mean Enrique Kaufman only. In 1958 petitioner received the degree of Doctor of Medicine from the University of Buenos Aires, School of Medicine, in Argentina. On July 16, 1968, he reported for duty at Rollman Psychiatric Institute (sometimes hereafter "Rollman") in Cincinnati. He was enrolled in a 3-year program for physicians with four years' experience in nonpsychiatric practice. Prior to his appointment at Rollman, *170 petitioner submitted an application to the Ohio Department of State Personnel. He also corresponded with Russell D. Steele, M.D., Chief of Research & Training at Rollman with regard to a resident's expected stipend, availability of living quarters for residents with families, costs of food, and the possibility of Rollman reimbursing petitioner for travel expenses to be incurred in bringing his family to Cincinnati. Steele replied that petitioner's stipend for the first year of residency would be $13,104, subject to approval by the departments of the State of Ohio having authority over such matters. Steele also furnished general information on costs of private rental housing and food prices and notified petitioner that Rollman was not able to pay petitioner's transportation fares or to extend credit. Petitioner's application was approved and he was placed on the payroll of the Department of Mental Hygiene & Correction of the State of Ohio. Federal income tax was withheld from his stipend, and he was furnished a Form W-2, Wage & Tax Withholding Statement for 1969. Rollman Psychiatric Institute was opened in 1955 in response to reform legislation in Ohio as well as many other states *171 aimed at remedying inadequate and inhumane care of the mentally ill. Ohio added a Bureau of Psychiatric Training and Research to its Mental Hygiene Department and launched plans for three receiving hospitals providing short-term but intensive treatment of the mentally ill. There are now six psychiatric and receiving institutions in Ohio, and their function is distinguishable from that of a larger number of state hospitals for the mentally ill which provide extended care. Another function of Rollman is to provide training to doctors who wish to specialize in psychiatry. At the time Rollman was founded, it was thought that scientific advances in the field of psychiatry were lagging behind those of other medical specialties and that too few students and scientists were attracted to psychiatry. Towards the end of fulfilling one of its statutory goals of conducting training programs, Rollman offers classroom training which occupies 30 to 40 percent of the time of the residents. However, the residents are not obligated to render future services to the State of Ohio or its departments as a result of receipt of such instruction, nor are they encouraged to enter private practice in Ohio. *172 Section 5129.01(B), Ohio Revised Code, vests with the Bureau of Psychiatric Training and Research the authority to carry on research and investigation into the causes and prevention of mental illness. Rollman was not engaged in any scientific research work during the taxable year in question. Formerly, two psychologists were carrying on research on a part-time contractual basis into the relationship between mental illness and glue sniffing and certain drug use. The daily cost of treating a patient at Rollman is three to four times greater than that at larger hospitals which treat psychiatric patients. The staff at Rollman is large in comparison to the patient load and consists of 6 full-time psychiatrists, 11 university affiliated psychiatrists, and 29 residents such as the petitioner. However, the inpatient hospital at the institute contains only 125 beds; the outpatient clinic receives about 14,000 visits annually. Rollman receives preferential treatment from the Probate Courts in its vicinity as to referrals. Rollman has discretion to accept or reject cases referred to it from courts. In practice probate judges refer psychiatric cases to Longview *173 State Hospital in Cincinnati unless it clearly appears that a patient referral would be particularly appropriate for Rollman and Rollman has space for the patient. Longview has no such option. In most other respects, the Rollman Institute operates like a typical organization rendering health care services to the general public. Notwithstanding instruction given residents in a classroom setting, Rollman is operated on the basis that psychiatric training is best acquired through exposure to patients and to actual diagnosis and therapy. The residents are rotated among Rollman and Longview State Hospital and the Dayton Childrens' Psychiatric Hospital. The stipends paid to residents are uniform and are increased in the second and third years of the program in accordance with a published pay scale. A lower pay scale applies to residents appointed to Rollman with less than four years of practice experience. The requirements for selection for an appointment at Rollman are a degree from a medical school and completion of an internship in a program approved by the American Medical Association. Rollman receives an average of 15 to 20 applications annually and grants 10 or 11 appointments. *174 Financial need is not a factor in selecting the new appointees. Petitioner's first-year duties at Rollman included obtaining a complete medical history from newly admitted patients, conferring with a senior staff physician on his findings, issuing signed standing orders for treatment and care, prescribing sedatives, antibiotics, narcotics or anticoagulants if necessary. Petitioner is subject to the supervision of staff physicians in the performance of his duties. Ultimate Finding The stipend received in 1969 by petitioner from Rollman Psychiatric Institute constitutes compensation for services rendered by petitioner. Opinion A determination as to whether petitioner is entitled to exclude from income $3,600 of the stipend received from Rollman must focus on section 1.117-4(c), Income Tax Regs. The regulations under section 117 have specifically been upheld by the United States Supreme Court in Bingler v. Johnson, 394 U.S. 741 (1969). Section 1.117-4(c) (2) states that an amount paid to an individual to enable him to pursue studies or research "primarily for the benefit of the grantor" is not considered a scholarship or fellowship grant. The regulation further *175 provides that the "primary purpose" of the studies or research must be to further the education and training of the recipient "in his individual capacity" if the amount paid is to be deemed excludable under section 117. Petitioner does not stress any unusual features of his appointment; rather, it is the nature of his work at Rollman and the objectives of Rollman that petitioner basically urges in support of his contention that the stipend received constituted amounts received as a scholarship or fellowship. It cannot be denied that petitioner receives valuable training and indeed classroom instruction at Rollman. Yet we are not convinced that the primary purpose of such training is to enhance petitioner in his individual capacity and not merely to better prepare the petitioner to render psychiatric services for the benefit of Rollman and the State of Ohio. It appears more accurate to conclude that the training petitioner received was incidental to the services he performed. See Irwin S. Anderson, 54 T.C. 1547 (1970) and Aloysius J. Proskey, 51 T.C. 918 (1969). The greater emphasis on didactic instruction at Rollman and perhaps the more reflective *176 nature of petitioner's specialty may superficially support the view that a psychiatry residency is different from nonpsychiatric residencies. There is no legal support for that view, however. Petitioner stresses that his services were not really essential because the Rollman staff was large. Therefore, petitioner's work at Rollman could be viewed as being primarily for his own benefit. We have encountered this argument before in Frederick Fisher, 56 T.C. 1201, 1215 (1971), which also involved the case of a resident in psychiatry. Whether or not the resident is indispensable, it cannot follow necessarily that he did not in fact render services and that he was not compensated for those services. Petitioner cites Wrobleski v. Bingler, 161 F. Supp. 901 (W.D. Pa. 1958), which held that the stipend paid to a resident in psychiatry at the Western State Psychiatric Institute and Clinic in Pennsylvania constituted an excludable scholarship or fellowship. We distinguished this case in Fisher, supra, noting a finding that Western State Psychiatric Institute and clinic was primarily an institution for teaching and research was essential to the holding *177 of the District Court. The Commissioner has pursued the distinction between service oriented and teaching institutions and the relevance of this distinction to the section 117 in Rev. Rul. 71-106, 1971-1 C.B. 35, Rev. Rul. 72-70, 1972-1 C.B. 39 and Rev. Rul. 72-568, 1972-48 I.R.B. 5. We cannot conclude that the Rollman Psychiatric Institute is primarily a research and teaching organization. The Superintendent of Rollman, John T. Toppen, M.D., petitioner's witness (and the only witness - petitioner himself did not testify) stated that not much research has been carried on recently at Rollman. As for teaching, actual classroom or didactic instruction does not require even half the petitioner's time. Learning through exposure to patients, to which residents devote most of their time at Rollman, could not be deemed primarily a teaching function. The history of Rollman above, which we sketched in our fact findings, shows that it was established by the State of Ohio to remedy a deficiency in mental hygiene services in that state. Although Rollman has enjoyed certain privileges in that state, since its beginning it has served the mental health needs of the *178 general population of Cincinnati and its environs. We think Rollman is distinguished from hospitals that receive psychiatric cases only in that it provides short-term intensive care. We note also that many of the indicia of an employment relationship are present in petitioner's case. On previous occasions we have relied on the withholding of income tax at the source from the taxpayer's stipend, a fixed pay scale based on years of seniority, the lack of tailoring of the stipend to the needs of the individual recipient, and a large number of patient visits to the grantor's facility as an indication of compensation and not a scholarship or fellowship. See Jerry S. Turem, 54 T.C. 1494 (1970); Jacob T. Moll, 57 T.C. 579 (1972). We hold on the basis of the entire record that the stipend received by petitioner in 1969 was not a fellowship or scholarship within the meaning of section 117 but was taxable compensation under section 61. Decision will be entered for the respondent. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, unless otherwise specified. ↩