WESLEY E. McENTIRE AND SHIRLEY A. McENTIRE, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
McEntire v. Commissioner
Docket No. 6063-72
United States Tax Court
T.C. Memo 1974-181; 1974 Tax Ct. Memo LEXIS 138; 33 T.C.M. (CCH) 780; T.C.M. (RIA) 74181; July 9, 1974, Filed. James Smith, for the petitioners. John B. Mostiler, for the respondent. FAY
MEMORANDUM FINDINGS OF FACT AND OPINION FAY, Judge: Respondent has determined deficiencies in petitioners' Federal income tax for the taxable years 1969 and 1970 in the amounts of $727.19 and $662.10, respectively. The sole issue presented for decision is whether the petitioners are entitled to exclude $3600 from their gross income in each of the years 1969 and 1970 as a scholarship or fellowship grant under section 117. [1]
*139 FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. The stipulation of facts and the exhibits attached thereto are incorporated herein by this reference. The petitioners, Wesley E. McEntire and Shirley A. McEntire, are husband and wife who resided in Galveston, Texas, at the time they filed their joint Federal income tax returns for the calendar years 1969 and 1970 with the district director of internal revenue, Austin, Texas. At the time of filing the petition herein petitioners resided in Memphis, Tennessee. Any reference to "petitioner" hereinafter will be deemed to mean Wesley E. McEntire. Petitioner is a physician. He received his M.D. degree from the Medical College of Virginia. During the years 1969 and 1970 petitioner was a resident in psychiatry in the Department of Neurology and Psychiatry at the University of Texas Medical Branch (Medical Branch) at Galveston, Texas. The Medical Branch is composed of nine hospitals with a combined capacity of more than 1200 beds in which some 56,000 inpatients are treated each year. Part of the Medical Branch is the Department of Neurology and Psychiatry maintaining 274 psychiatry and 57 neurology *140 beds. Over 1800 psychiatric inpatients are admitted each year to the Medical Branch for psychiatric care. In addition an outpatient psychiatry clinic is maintained which treats numerous patients. The majority of psychiatric patients are private patients with private physicians. Nevertheless all of the 274 psychiatric inpatients are available and used for teaching purposes. The Medical Branch's primary concern, however, is not teaching but rather giving the best possible care to its patients. Included in the various programs available at the Medical Branch is an accredited residency training program in psychiatry. The program is under the auspices of the American Board of Psychiatry and Neurology and the AMA Council on Medical Education and Hospitals. A general psychiatry residency consists of a three-year program with varied duties each year as proficiency in the field expands. During the years in question here the Medical Branch was a recipient of a National Institute of Mental Health (NIMH) grant. These grants included funds to be used to provide "trainee stipend awards" for young doctors engaged in psychiatric residency programs. An NIMH publication, entitled "Grants *141 and Awards of the National Institute of Mental Health for Graduate and Undergraduate Training" offers the following insight into these grants: PART 1 - GENERAL INFORMATION AUTHORITY FOR SUPPORT The Public Health Service Act, as amended by the National Mental Health Act, authorizes the Surgeon General of the Public Health Service to award grants of funds to public and private non-profit institutions to assist in the establishment, expansion, and improvement of training programs in the mental health disciplines and in other fields having relevance to mental health. Under this authority various grant programs have been established since 1947 to support professional and research training of mental health personnel at the graduate and postgraduate level and psychiatric training for relevant medical personnel at the undergraduate level. The programs are described in detail in Parts II, III and IV. PURPOSE OF GRANTS AND AWARDS The objectives of these grants are to improve the quality of mental health training; to enlarge the capacity for training people; to help in the development of specialize training programs; and, through trainee stipend awards, to enable a greater number *142 of persons to pursue careers in the mental health disciplines and related areas. The grantee is free to pursue the training program in whatever manner is deemed most promising to achieve the proposed training objectives. To accomplish these purposes training institutions may request funds: (1) to defray teaching costs; and (2) to provide trainee stipends for residents and students enrolled in the training programs. Funds for both teaching costs and trainee stipends may be requested in the same application form. The trainees are selected and appointed by the training institution, and the funds allocated for trainee stipends are paid by the training institution to the appointees. Trainee stipend grants are not awarded directly to individuals by the National Institute of Mental Health. (Emphasis added. Double underlined portion was italicized in original.) * * * PROGRAM DIRECTION Training programs supported by grant funds shall be under the specific direction of a designated program director. The program director shall be that person designated as functionally responsible for the program. If a change in the program director is proposed, the National Institute of Mental *143 Health must be immediately informed, and must be furnished with the name and a statement of the qualifications of the proposed new program director. If a co-director is proposed after a grant is activated, his name and qualifications must be submitted.
* * * Petitioner was a resident in psychiatry in the years 1969 and 1970. His duties included, among other things, the following: recording patient histories, giving physical examinations, maintaining progress reports on patients' records, writing transfer notes when patients transfer to other services, obtaining patients' consent to surgery or therapy, completing of proper procedures when accidents occurred within the hospital to patients or employees, preparing discharge orders, preparing case summaries after patients were discharged, accompanying and supervising medical students assigned to the Department of Neurology and Psychiatry and conducting bedside teaching rounds for medical students. In addition petitioner spent at least one afternoon a week in the outpatient clinic, where, under supervision, he treated patients. As a psychiatric resident petitioner was paid certain amounts by the Medical Branch in return for the *144 above services. These amounts came partly from state funds supplied to the Medical Branch and partly from funds supplied to the Medical Branch by the NIMH grant. The state originated funds were paid to the petitioner from the payroll account of the hospital and amounts were withheld for social security, withholding tax, and health insurance. A separate check was given to the petitioner by the Medical Branch for payments from the NIMH grant. This money, when received by the Department of Neurology and Psychiatry from the NIMH, was kept in a separate fund by the University of Texas Medical Branch. Notwithstanding the origin of the funds, both payments to the petitioner came from accounts under the name of the Medical Branch. During the years in question petitioner received the following amounts directly from the Medical Branch: Year
Total Received
State Origin
NIHM Grant 1969
$8,640
$2,400
$6,240
1970
$10,872
$2,880
$7,992
Petitioner received, in addition, "fringe benefits" taking the form of vacations, hospitalization and malpractice insurance, white uniforms, laundry service for the uniforms and he was eligible to use the employees' credit *145 union. Pursuant to his view that the amounts paid to him by the Medical Branch, which had originated from the NIMH grant, represented a fellowship grant, the petitioner excluded $3600 (12 x $300) [2] from the gross income reported on his Federal income tax return for the year 1969. A like amount was excluded by petitioner from his gross income for the year 1970 for the same reason. Respondent, *146 in his notice of deficinecy dated May 5, 1972, increased petitioner's gross income for the years in question by the $3600 excluded by petitioners in each of the two years. OPINION We are once again asked to make a determination as to whether a medical resident is entitled to exclude $3,600 from his gross income as a scholarship or fellowship grant under section 117. Section 117 provides an exclusion from gross income of certain amounts received as a scholarship or a fellowship grant. [3] The question of whether a particular sum represents a scholarship or fellowship depends upon the purpose for which the amount was granted and the nature of the activities conducted by the recipient. See Section 1.117-3(c), Income Tax Regs. An amount paid to an individual to enable him to pursue studies or research will not be considered a fellowship grant if it represents compensation for employment services. Section 1.117-4(c) (1), Income Tax Regs. See also Bingler v. Johnson, 394 U.S. 741 (1969). *147 After closely reviewing all the facts in the matter before us, we hold that the amounts paid to petitioner in the years 1969 and 1970 represented compensation for his services to the Medical Branch. As a resident in psychiatry, petitioner provided both extensive and valuable services to the Medical Branch. He performed a broad spectrum of duties, under the direct or indirect supervision of attending physicians, ranging from recording patient histories to supervising medical students assigned to the Department of Neurology and Psychiatry. We think this indicates that the sums received by the petitioner were compensatory in nature. See Frederick Fisher, 56 T.C. 1201 (1971); Irwin S. Anderson, 54 T.C. 1547 (1970); and Aloysius J. Proskey, 51 T.C. 918 (1969). In addition, the financial arrangements between petitioner and the Medical Branch are indicative of an employer-employee relationship. The monetary payments made to him were not based upon financial needs, as is generally true of fellowship grants, see Edward A. Jamieson, 51 T.C. 635 (1969), but rather were dependent only on his length of service as a resident. Moreover *148 petitioner was entitled to "fringe benefits" normally associated with an employment relationship. See Woddail v. Commissioner, 321 F.2d 721 (C.A. 10, 1963), affirming a Memorandum Opinion of this Court. Petitioner received, among other things, paid vacations, hospitalization and malpractice insurance, and he was eligible for membership in the employees' credit union. We do not believe that these benefits are of a type normally associated with the term "fellowship grant". See Elmer L. Reese, Jr., 45 T.C. 407 (1966), affirmed per curiam 373 F.2d 742 (C.A. 4, 1967). Petitioner has conceded that he performed services for the Medical Branch and that he was compensated for such services. However, he argues that payments for his services came from the state-originated funds provided to the Medical Branch and paid out through its payroll account. Petitioner contends that the amounts he received from the Medical Branch which originated from the NIMH grant were not compensation for services. Rather, these sums represented an opportunity to further his studies in psychiatry and no services were required for these sums other than those incidental *149 to his training. We disagree with petitioner's contentions. As this Court stated in Frederick Fisher, supra, at 1214, where the petitioner therein presented an argument similar to that which is before us presently: Petitioner has emphasized that the $3,600 here in issue is attributable to the NIMH grant to the Center, that petitioner did not perform services for the benefit of NIMH or under its supervision, and that the purpose of the NIMH program was to enable a greater number of persons to pursue careers in mental health disciplines and to improve the quality of mental health in the United States. Petitioner urges that NIMH is the "grantor" of the funds in issue and that it made disinterested payments primarily for the purpose of furthering petitioner's education. We disagree.We think that, under the circumstances herein, the Center, and not NIMH, must be considered the grantor of the payments. NIMH's own publication provided that "Trainee stipend grants are not awarded directly to individuals by the National Institute of Mental Health;" that such grants were made only to training institutions; that in order to benefit from the grants individual physicians were *150 required to apply to the funded institutions; and that the institutions would select and pay the individuals they had chosen. Apart from establishing minimum educational and citizenship requirements, NIMH left selection of the recipient entirely to the Center. The Center's "program director," not NIMH, was responsible for the residents' duties at the Center. In light of all the additional evidence revealing the compensatory nature of the payments, we consider the foregoing circumstances to be highly significant. Although NIMH's grant to the Center may well have been disinterested and noncompensatory in nature, the Center's grant to petitioner was quite different. * * * [This Court held therein that the petitioner had received payments from the Center in return for the services he rendered.] Cf. Bingler v. Johnson, 394 U.S. 741, 743, fn. 4; Jerry S. Turem, 54 T.C. 1494, 1505-1506; Marjorie E. Haley, 54 T.C. 642, 647; Rev. Rul. 71-346, 1971-2 C.B. Petitioner further maintains that the primary function of the Medical Branch was the training of medical personnel and doctors. He therefore argues that the payments he received *151 were primarily for the purpose of continuing his education as a resident in psychiatry. We disagree. Although we have no doubt that petitioner received highly valuable training as a resident, we think it clear from the record in this case that the Medical Branch was not operated solely as a teaching institution. Rather, the Medical Branch existed primarily for the care and treatment of the ill and petitioner's function was to aid in that care. See Aloysuis J. Proskey, supra.Compare Wrobleski v. Bingler, 161 F. Supp. 901 (W.D. Pa., 1958). Petitioner also argues that during his residency the Medical Branch was quite capable of functioning without the services of its residents. For the same reasons as enumerated in Fisher, supra, at 1215, we do not believe that the payments made to residents are noncompensatory merely because the hospital could "operate" without them. Additionally petitioner relies on Leathers v. United States, 352 F. Supp. 1244 (E.D. Ark., 1971), affd. 471 F.2d 856 (C.A. 8, 1972), certiorari denied, 412 U.S. 932 (1973); and Wrobleski v. Bingler, supra. We find *152 his reliance misplaced. These cases are factually distinguishable from the matter at hand. In Leathers, a jury found that the payments made to the taxpayer were made primarily for the purpose of furthering the taxpayer's education and training. We have made no such finding here. In Wrobleski, the District Court found that the Western State Psychiatric Institute and Clinic was primarily an institution for teaching and research. That is not the case here. Therefore, for all the reasons stated above, we hold that the payments made to the petitioner in 1969 and 1970 were for services rendered to the Medical Branch and do not qualify for the exclusion of section 117. Decision will be entered for the respondent. Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated. ↩
2. Section 117(b) (2) (B) provides as follows: (B) Extent of Exclusion. - The amount of the scholarship or fellowship grant excluded under subsection (a) (1) in any taxable year shall be limited to an amount equal to $300 times the number of months for which the recipient received amounts under the scholarship or fellowship grant during such taxable year, except that no exclusion shall be allowed under subsection (a) after the recipient has been entitled to exclude under this section for a period of 36 months (whether or not consecutive) amounts received as a scholarship or fellowship grant while not a candidate for a degree at an educational institution (as defined in section 151(e) (4)). ↩
3. See section 117(b) (2) which imposes a monetary limit to the section 117↩ exclusion of $300 per month for individuals, such as petitioner, who are not candidates for a degree.