Joseph D. Woddail and Susan M. Woddail v. Commissioner.
Woddail v. Commissioner
Docket No. 92232.
United States Tax Court
T.C. Memo 1962-232; 1962 Tax Ct. Memo LEXIS 75; 21 T.C.M. (CCH) 1248; T.C.M. (RIA) 62232; October 2, 1962
Robert F. Roeser, Esq., 905 William Oliver Bldg., Atlanta, Ga., for the petitioners. Arthur T. Tranakos, Esq., for the respondent. DAWSON
Memorandum Findings of Fact and Opinion DAWSON, Judge: The respondent determined a deficiency in petitioners' 1955 income tax in the amount of $396. The only issue for decision is whether the amount of $1,800 received by petitioner, Joseph D. Woddail, in 1955 from the Winter Veterans Administration Hospital was excludable from gross income as a scholarship or fellowship grant under section 117 of the Internal Revenue Code of 1954. Findings of Fact All facts have been stipulated and are so found. The stipulation of facts and all exhibits attached thereto are incorporated herein by reference. Petitioners, Joseph D. and Susan M. Woddail, husband *76 and wife, now residing in St. Louis, Missouri, filed a joint income tax return for the calendar year 1955 with the district director of internal revenue for the district of Kansas. In their return the petitioners reported the amount of $3,535.40 as received from the Winter Veterans Administration Hospital (hereafter referred to as Hospital) and excluded $1,800 ( $300 per month for the six months from July 1, 1955 through December 31, 1955) as a tax-exempt fellowship. Joseph D. Woddail (hereafter referred to as the petitioner) is a medical doctor licensed by the State of Georgia. Prior to July 1, 1955, he was engaged in the general practice of medicine in Forest Park, Georgia. His net income from the general practice of medicine for the three years prior to 1955 was as follows: $26,842.02 for 1952; $31,544.36 for 1953; $22,297.29 for 1954. A contract was entered into on July 1, 1955, by the petitioner and the Hospital which reads as follows: 1. This shall be considered my application for residency training in neurology or psychiatry contemporaneously with my employment, now existing or to begin within 60 days from this date, as a full-time physician in the Department of Medicine *77 and Surgery of the Veterans Administration, such employment to include residency training in psychiatry or neurology. This application for such residency training is conditioned upon my candidacy therefor being approved by the Deans Committee or the Sub-committee in Neurology or Psychiatry, and also approved by the Manager of the Veterans Administration Hospital at Topeka, Kansas. 2. While in the employ of the Veterans Administration as aforesaid I shall be paid the regular salary of a full-time physician in the grade at which I am assigned and without deduction or charge by reason of absence from the duties of such physician for the purpose of pursuing said residency study or training in accordance with the program therefor from time to time approved and adopted by the Veterans Administration. All of such training and instructions shall be without charge to me for tuition or other expenses thereto. 3. Such residency training shall be for such period of time and embrace such subjects and types of training and shall be followed continuously or intermittently, for such periods and with such intermissions as the Veterans Administration may determine. 4. I will accept any transfer *78 ordered by the Veterans Administration from one station to another station, same to be at Government expense with respect to me and my family and my household goods insofar as the then applicable Government regulations will permit. 5. The duration of the training herein contemplated may be one year or two years or three years, as determined by the Veterans Administration. In consideration of the providing of such training as may be awarded to me, I agree to remain in the employment of the Veterans Administration as a full-time physician in the Department of Medicine and Surgery in the field of psychiatry or neurology thereof as follows: (a) For one year served in training status, the obligated service shall be one additional year. (b) For two years served in training status, the obligated service shall be one and one-half additional years. (c) For three years served in training status, the obligated service shall be two additional years. The term "year served in training status", as used herein, means 12 months or any portion of a year of six months or more. 6. The periods of employment mentioned above which exceed the respective periods of training are herein referred *79 to as "obligated service periods". The Veterans Administration shall be entitled to such "obligated service periods": in whole or in part, either at the end of the first year's training or at the end of the second year, if any, or at the end of the third year, if any. In the event that such "obligated service" occurs prior to completing the total training period awarded me, and at a hospital different from that where I was originally enrolled as a resident, I shall return to such hospital to complete such residency training but such return shall be at the expense of the Government, with transportation of myself, my family, if any, and household goods, within the limits of the then applicable Government regulations. 7. Nothing herein shall be construed so as to create an obligation on the United States to pay me any specific salary or to retain my services for any specific period; both of such matters being governed by the appropriate regulations from time to time effective and applicable thereto. 8. Unless my employment shall be earlier terminated by the Government, I shall be obligated to continue said employment in the Department of Medicine and Surgery of the Veterans Administration *80 in the field of psychiatry or neurology at such station or stations designated by the Chief Medical Director of the Veterans Administration during the period of "obligated service" consequent thereon as hereinabove stated and because the amount of damages for breach of this agreement would be difficult of exact ascertainment, it is now agreed that I shall be obligated to pay to the United States not as a penalty but as agreed liquidated damages the sum of $2655.00 for each year (12 months) or each lesser period of six months or more for which I fail to perform the obligated service hereby assumed. 9. It is further agreed that if I resign my status as a career resident before the end of the sixth month of my training, I shall repay the Government the difference between the salary I have actually received and the salary I would have received had I been appointed under Section 14(b), Public Law 293, 79th Congress, as amended, as a regular resident during this period of employment. The petitioner commenced his residency at the Hospital on July 1, 1955, and entered training at The Menninger Foundation (hereafter referred to as the Foundation). On July 19, 1951, a contract was entered *81 into by the Veterans Administration (hereafter referred to as VA) and the Foundation whereby the Foundation agreed to furnish, through its school of psychiatry, a course of instruction and training (hereafter referred to as the Program) for the hospital at Topeka, Kansas. This contract was in effect throughout 1955. Such contract reads as follows: WHEREAS, the Veterans Administration, in the execution of laws it is charged with administering, has determined the necessity of maintaining a course of instruction and training in psychiatry for Veterans Administration residents at the Veterans Administration Hospital at Topeka, Kansas, which the Veterans Administration with present personnel and facilities is not able to furnish, and WHEREAS, The Menninger Foundation, a corporation, situated at Topeka, Kansas, is available to render professional services necessary for the operation and maintenance of such course of instructions and training in psychiatry to the extent specified in paragraphs 1 and 2 hereof, agreement is hereby entered into between the Veterans Administration and The Menninger Foundation, hereinafter referred to as the Contractor, as follows: 1. The Contractor agrees, *82 subject to approval by the Veterans Administration, to plan and to provide general supervision of a course of instruction and training to be given residents in psychiatry at Veterans Administration Hospital, Topeka, Kansas. This includes lecture courses, seminars, section conferences, training in neuropathology and neurophysiology, and other appropriate instruction and training as required by the Veterans Administration for residents in psychiatry. The instruction and training planned and supervised by the Contractor must meet all the requirements to qualify Veterans Administration residents for acceptance to examination given by the American Board of Psychiatry and Neurology in addition to the requirements hereinafter required by the Veterans Administration. Schedule No. 1, attached hereto, is provided as a guide for the Contractor in preparing material for conducting the training required herein. The Manager, Veterans Administration Hospital, Topeka, Kansas, is authorized to make such deviations to Schedule No. 1, attached, as required by the Veterans Administration and to meet current or future requirements of the American Board of Psychiatry and Neurology or the Veterans Administration. *83 2. In addition to the sevices to be rendered as described in paragraph 1, hereinabove, the Contractor agrees to provide all necessary supervision of the course of instruction and training for residents in psychiatry at Veterans Administration Hospital, Topeka, Kansas. This not only includes supervision of the program of instruction and training, but also includes supervision of such supplementary instruction and training as may be furnished by the Veterans Administration from its own staff or otherwise, when such supplementary instruction or training is deemed necessary by the Veterans Administration. It is understood that any supplementary instruction and training as referred to in the foregoing will be so provided at the expense of the Veterans Administration, apart from and independently of the compensation hereinafter provided for the services of the Contractor under the terms of this agreement, provided that employees of the Contractor or designates thereof will be accorded permission for attendance at or participation in such supplementary instruction or training, subject to such accommodations as may be available after the needs of Veterans Administration residents are first *84 met in all respects and provided further that, reciprocally, Veterans Administration residents or designates are provided like accommodations at lectures, seminars, or other instruction or training afforded by the Contractor in relation to the administration of its own activities in addition to the services provided above. 3. In consideration of the services as provided in paragraphs 1 and 2 above, the Veterans Administration agrees to pay the Contractor the sum of $50,000 per year for such services when between 40 and 60 Veterans Administration residents, inclusive, are in training in psychiatry at Veterans Administration Hospital, Topeka, Kansas. The Veterans Administration further agrees to pay the Contractor an additional sum of $12,50 per year for each group of residents numbering from one to five, inclusive, in excess of 60 residents undergoing training in psychiatry at Veterans Administration Hospital, Topeka, Kansas. The sum for which the Contractor is entitled to reimbursement as described hereinabove will be reduced by $833 per year for each position for residents in psychiatry not filled below the number 40. 4. The Veterans Administration agrees to furnish the Contractor *85 space and facilities at the Veterans Administration Hospital, Topeka, Kansas, for the purposes of providing the services in paragraphs 1 and 2, above. Such space and facilities will be furnished only to the extent determined necessary by the Manager, Veterans Administration Hospital, Topeka, Kansas. 5. No separate charge will be made by the Contractor or any employee thereof, for the supervision of the care and treatment of veteran patients in the Veterans Administration Hospital, Topeka, Kansas, when such supervision of care and treatment is incident in whole or in part to the services for which reimbursement is provided in paragraph 3 above. This agreement does not preclude the Contractor or employees thereof from performing services on a temporary full-time, part-time or fee basis, subject to the provisions of existing laws, for the care and treatment of patients of the Veterans Administration Hospital, Topeka, Kansas, or elsewhere, Provided such services are wholly apart from and independent of the services outlined in paragraphs 1 and 2 above, and for which reimbursement is provided in paragraph 3 above, Provided further that the Contractor, or any employee thereof, will make *86 no charge again the Veterans Administration for consultation, care, or treatment of any patient or any consultation service rendered on the same day that the person participates in the services performed by the Contractor under the provisions of paragraphs 1 and 2 above. This provision is expressly intended to eliminate any possibility of duplicate payment by the Veterans Administration for services rendered; however, if any such charge is made and erroneously paid by the Veterans Administration, it will be refunded by the Contractor. 6. It is recognized by the Veterans Administration that the curriculum of study, instruction, and training, as outlined in Schedule No. 1, attached, is subject to variation and change. Schedule No. 1, attached, is therefore a guide only for the use of the Contractor and the Manager, Veterans Administration Hospital, Topeka, Kansas. The Manager, Veterans Administration Hospital, Topeka, Kansas is charged with the responsibility of insuring that the services performed by the Contractor, as specified in paragraph 1 and 2 above, meet the requirements of the Veterans Administration and that the training, instruction, and supervision, furnished by the Contractor, *87 fully meet the requirements of the American Board of Psychiatry and Neurology at all times. Any changes to Schedule No. 1, attached, authorized or required by the Manager, Veterans Administration Hospital, Topeka, Kansas, will not affect the compensation to be paid the Contractor as specified in paragraph 3 above. 7. The Contractor agrees to submit in writing to the Veterans Administration during the period of the contract, at intervals specified by the Veterans Administration, reports of the progress of the residents receiving instruction and training under the terms of this agreement, furnishing such information as the Veterans Administration may require. 8. Duly authorized representatives of the Veterans Administration shall be permitted to vist the Contractor and to examine the training facilities and the work of the residents receiving instruction and training under this agreement. A copy of the schedule of studies to be followed by each resident shall be made available to the Veterans Administration. 9. [Manner of presentation and payment of invoices.] 10. Services by the Contractor under this agreement will be rendered at the Veterans Administration Hospital, Topeka, *88 Kansas, or at The Menninger Foundation situated at Topeka, Kansas, or at such other place or places as may be designated or approved by the Veterans Administration. 11. The Contractor warrants that the tuition charges provided for herein are not in excess of those charged residents from sources other than the Veterans Administration. For the purposes of this paragraph it is understood that the tuition rate per resident per year is $833. 12. - 16. [Formal provisions regarding nondiscrimination, effective dates, settlement of disputes, etc.] The attached Schedule No. 1 reads as follows: SCHEDULE NO. 1
FOR FISCAL YEAR 1952 CONTRACT
Number of
Subject
Meetings
Hours
a. Program for first-year residents
(1) Lectures and lecture courses
(a) Orientation
Psychiatric Case Study
15
15
(b) General Psychopathology
35
35
(c) Psychiatric Treatment Methods
22
22
(d) Basic Neurology
17
17
(2) Seminars
Basic Psychiatric Literature
40
80
b. Program for second-year residents
(1) Lecture courses
(a) Principles of psychotherapy (second course)
25
25
(b) Clinical Neurology
20
20
(c) Personology
20
20
(2) Seminars
Practical Applications of Psychiatry to Social Situations
8
16
(3) Control Groups - Psychotherapy Techniques
3 groups - each 40 meetings, 80 hours
Total
120
240
(4) Neurological Laboratory Work
(a) Neuroanatomy
17
34
(b) Neuropathology
17
34
(c) Psychosomatic Concepts of Automanic Physiology
5
5
(5) And in addition complete supervision of residents assigned to The
Menninger Clinic Adult Division for Hospital and/or Out
Patient Services.
c. Program for third-year residents
(1) Lecture course
(a) Principles of Psychotherapy (third course)
20
30
(b) Marriage and Family Counselling
12
12
(2) Seminars
(a) Principles of Dynamic Psychiatry
70
140
(3) Control Groups - Psychotheraph Techniques
3 groups - each 40 meetings, 80 hours
Total
120
240
(4) Individual Control Sessions in the Application of Psychotherapy
250
(5) And in addition complete supervision of residents assigned to The
Menninger Clinic Adult Division for Hospital and/or Out
Patient Services; also complete supervision of residents as-
signed to the Children's Division of The Menninger Clinic.
d. Miscellaneous teaching hours not restricted to any particular year
of study
300
*89 The adoption of a resident trainee program and the appointment of persons such as the petitioner to residencies was merely incidental to and for the purpose of facilitating the raison d'etre of the Hospital, namely, the care of its patients. Residents with the Hospital accumulate annual and sick leave. Deductions are made from such leave or from pay for any period of leave taken. Residents are paid solely by the VA, which withholds a portion of such payments as income tax withheld at source. The Hospital charges payments made to residents to the same accounts as salaries paid to staff physicians, but sometimes refers to the payments to residents as "stipends" rather than "salaries". For United States Civil Service Commission purposes, the petitioner was classified as a "Physician". The VA has the ultimate authority under its contract with the Foundation to determine the nature of instruction and training to be given a resident placed under the Program. Such instruction and training must meet the requirements both of the VA and of the American Board of Psychiatry and Neurology (hereafter called the Board). In addition to payments to the residents themselves, the VA pays the Foundation *90 an amount for its part in the Program, designating the latter as "Training Funds." Residents in psychiatry under the Program are sometimes referred to as fellows in the Menninger School of Psychiatry. Upon successful completion of the residency, each resident receives a certificate from the school attesting the completion of the course of instruction. A resident receiving payments from the VA of the type here in issue may be assigned to one or more of several affiliated institutions for training unavailable at a VA hospital. Such assignments may include the Shawnee Guidance Clinic, which provides psychiatric counseling and treatment, on an outpatient basis, for the community of Topeka and Shawnee County; the Student Health Center, for experience mainly in psychotherapy of adolescents; and the Department of Child Psychiatry of The Menninger Foundation, which provides experience with both hospitalized and out-patient children. The VA continues to pay the resident during such periods and retains responsibility for his training. Such affiliated training may not in any instance exceed one-third of the residency period, and is based upon the needs and requirements of the VA. Absence *91 in excess of this period results in discontinuance of payments by the VA. Where it has been determined that a resident is to be assigned to an affiliated program, he must accept such assignment or terminate his residency, in which case he received no further payments from the VA. Residents at the Hospital under the program are not degree candidates. They may obtain certification in psychiatry by the Board after three years of residency and two years of practical experience. They perform professional services for the Hospital in the course of their residencies and are under the supervision and control of the VA while so engaged. The principal purpose of the Hospital is the care and treatment of patients. The Hospital operates 1,250 beds, of which 900 are in the Psychiatric Service divided into four sections and 100 are in the Neurological Service, normally with about 95 percent occupancy. The Psychosomatic Service, which is primarily a research and teaching unit, contains eight beds. The remaining 242 beds are in General Medical and Surgical Service. Approximately fourteen staff physicians and twenty-one residents are attached to the Psychiatric Service. No preference as to admission *92 is given to chronically ill patients over those with mental disturbances of a more or less common nature. The only preference or priority patients are those with service-connected disability, others being admitted in the order of application, as soon as facilities are available. The Psychiatric Service of the Hospital is divided into seven sections. Each section functions under the leadership of a chief, a senior physician, who is assisted by a team of psychiatrists (both fulltime staff members and consulting physicians) and other specialists from nursing, psychology, social work and physical medicine rehabilitation. The Neurological Service is similarly organized. Each section of the Neuropsychiatric Service of the Hospital operates an integrated clinical and educational program of conferences, demonstrations and seminars. All members of the staff of each section cooperate in the instruction of residents. The psychiatric staff provides both individual and group supervision. The normal workday of a resident is from 8:00 A.M. to 4:30 or 5:00 P.M., Monday through Saturday. Approximately eight hours per week during this period are devoted to instruction courses given by the Foundation. *93 The remaining time is spent at the Hospital under a Hospital staff physician, approximately one-third to one-half of the resident's day being devoted to didactic and clinical instruction, and the remainder to clinical work. Residents are normally used in the treatment of patients. This treatment is administered under the supervision of a section chief. This supervision is conducted by means of consultations between the resident and the section chief or senior physician. The treatment of the patient is administered or supervised by the resident to whom the patients are assigned. In the absence of the section chief, the responsibility to prescribe a course of treatment is delegated to the resident. A resident in the Psychiatric Service will have a certain number of patients, perhaps 25, assigned to him. His typical workday is in part approximately as follows: Hours
Conference with other ward
personnel
1/2
Check on activities of some
of assigned patients
1 to 1/2
Consultation with consultant
or section chief
1 to 2
Individual treatment of pa-
tients
1 and 1/2
Total
4 to 5 1/2 In addition, as residents progress in training and capability, they are given *94 increasing responsibility in supervising and training other personnel, such as nurses' aides and psychological therapists, and in interviewing and examining new admissions, under the supervision of a section chief. The latter task requires five to six hours per patient if undertaken by an experienced full-time staff psychiatrist and somewhat more time when performed by a resident. All fellows of the Foundation hold appointments as residents in psychiatry at either Winter Veterans Administration Hospital, Topeka, State Hospital, or the C. F. Menninger Memorial Hospital. Residents at all of the hospitals participate in the same program of didactic instruction, which takes the form of certain demonstrations, case presentations, or lectures. The petitioner engaged in the residence program for five years (three years of training and service status and two years of obligated service). He combined residency training with staff experience as required for certification in psychiatry by the Board. Immediately upon completion of the three-year training residency program and two years of obligated service, the petitioner resigned from the VA on July 2, 1960, and accepted a position with *95 the Community Mental Hygiene Clinic in East St. Louis, Illinois. Opinion A factual situation almost identical to that here involved was before this Court in the case of Ethel M. Bonn, 34 T.C. 64. It was there held that the entire amount received by the taxpayer from the Veterans Administration constituted compensation for services rendered and, therefore, was not excludable from gross income as a fellowship grant under the provisions of section 117 of the Internal Revenue Code of 1954. [1] We will follow that opinion.
Section 1.117-4(c) of the Internal Revenue Tax Regulations is set forth below. [2]
*96 Unlike the taxpayer in Ethel M. Bonn, supra, this petitioner contends that respondent's regulation is invalid or, alternatively, if the regulation is valid, the respondent has improperly applied it. We believe both contentions lack merit. Section 1.117-4(c) of the regulations has previously been declared valid in Frank Thomas Bachmura, 32 T.C. 1117; Aileene Evans, 34 T.C. 720; and Ussery v. United States, 296 F. 2d 582 (C.A. 5). Also see (1954) Conference Report, H. Rept. 2543, 83rd Cong., 2d Sess., Amendment No. 36. Since the regulation is valid and constitutional, the respondent was bound to follow it, and the petitioner has failed to show how or when the respondent has failed to do so. In fact, all action taken by the respondent appears to be clearly in accord with his regulation. Petitioner further contends that, in any event, at least a portion of the amount received by him from VA constitutes a fellowship grant and that an allocation should be made by the Court for the time he spent in receiving instruction in psychiatry. What the petitioner fails to realize is that until the existence of a scholarship or fellowship *97 grant has been established, no allocation is possible. Since we think there is no ground for concluding that a scholarship or fellowship grant was made by the VA to the petitioner, we find that no allocation is justified. Furthermore, the petitioner was not paid or given any amount of money to defray educational expenses. It was the obligation of the VA to pay for such expenses. In support of his allocation theory, the petitioner cites Harold DeJong, 36 T.C. 896. We think there is no basis for comparison. This petitioner has not qualified for the exclusion, where as in DeJong it was conceded that the taxpayer qualified, in part, for a charitable deduction. The situation here is similar to Norman R. Williamsen, Jr., 32 T.C. 154, wherein the taxpayers attended a special school as employee-trainees and were not paid any amount of money to defray edutional expenses. They were paid for by the employer. Consequently, this Court held that the amounts paid did not qualify for the exclusion. Petitioner relies principally upon Anderson v. United States (D.C. Minn.) (Unreported), 7 AFTR 2d 726; Wrobleski v. Bingler ( W.D. Penn.), 161 F. Supp. 901; *98 and Aileene Evans, supra. These cases are distinguishable on their facts. The basic difference between this case and the Anderson case is that Anderson was a candidate for a degree and rendered only those services required of all degree candidates. The petitioner here was not a candidate for a degree and was required to render services to the VA as part of his employment contract. In the Wrobleski case the hospital was solely a teaching hospital rendering no services to its patients except those incidental to teaching and research. For that reason the sole benefit from taking part in the curriculum of the hospital was derived from the residents studying therein. The hospital in Wrobleski was merely an extension of the laboratory at the University of Pittsburgh and the work was readily equated to classroom study. Here, as in Bonn, the Hospital was a service hospital and the work done by the petitioner was in furtherance of the service rendered by the hospital to its patients. It cannot be said that the Winter Veterans Administration Hospital was an extension of the classroom and laboratory work of The Menninger Foundation. Nor can it be said that the Hospital was set *99 up merely to educate doctors in psychiatry. The decision in the Aileene Evans case is likewise not in point because the contract between the State of Tennessee and Aileene Evans specifically provided for the payment of $160 per month "in order to enable the party of the second part [Aileene Evans] to complete more adequate training in the treatment and care of mental diseases and/or mental patients." She received no compensation of any character for such work. By contrast the petitioner here concurrently performed valuable professional services of a substantial nature essential to the operation of the Hospital. We hold that the petitioner is not entitled to have the $1,800 he received from the Hospital excluded from income as a scholarship or fellowship grant under section 117. Therefore, respondent's determination must be sustained. Decision will be entered for the respondent. Footnotes
1. SEC. 117. SCHOLARSHIPS AND FELLOWSHIP GRANTS. (a) General Rule. - In the case of an individual, gross income does not include - (1) any amount received - (A) as a scholarship at an educational institution (as defined in section 151(e)(4)), or (B) as a fellowship grant * * *↩
2. Sec. 1.117-4 ITEMS NOT CONSIDERED AS SCHOLARSHIPS OR FELLOWSHIP GRANTS. - The following payments or allowances shall not be considered to be amounts received as a scholarship or a fellowship grant for the purpose of section 117: * * *
(c) Amounts paid as compensation for services or primarily for the benefit of the grantor. (1) Except as provided in § 1.117-2(a), any amount paid or allowed to, on behalf of, an individual to enable him to pursue studies or research, if such amount represents either compensation for past, present, or future employment services or represents payment for services which are subject to the direction or supervision of the grantor.↩