MARVIN L. DIETRICH and MARJORIE DIETRICH, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Dietrich v. Commissioner
Docket No. 780-72.
United States Tax Court
T.C. Memo 1974-16; 1974 Tax Ct. Memo LEXIS 301; 33 T.C.M. (CCH) 66; T.C.M. (RIA) 74016; January 24, 1974, Filed *301 1. Petitioner, a resident physician in obstetrics and gynecology at the University of Nebraska Medical Center, received payments from the Center in 1969. Held, petitioner may not exclude any portion of the payments from his gross income as a scholarship or a fellowship grant. Sec. 117, I.R.C. 1954.
2. Held, petitioner is not entitled to deduct travel expenses in excess of those allowed by respondent. Truman Clare, for the petitioners.
Leonard A. Hammes, for the respondent. WILES
MEMORANDUM FINDINGS OF FACT AND OPINION
WILES, Judge: Respondent has determined deficiencies in petitioners' income tax for the years 1968 and 1969 in the amounts of $426.23 and $1,461.81, respectively. The issues 2 remaining for our decision are (1) whether the petitioners are entitled to exclude certain stipends from their *302 gross income for 1969 as a fellowship or scholarship grant under section 117[1] and (2) whether petitioners are entitled to deduct travel expenses in excess of those allowed by respondent.
FINDINGS OF FACT
Some of the facts have been stipulated and are found accordingly.
The petitioners, Marvin L. Dietrich (hereinafter referred to as petitioner) and Marjorie Dietrich, are husband and wife and maintained their legal residence in Omaha, Nebraska, at the time the petition was filed in this case. They filed their joint Federal income tax returns for 1968 and 1969 with the district director of internal revenue, Omaha, Nebraska.
Petitioner received a M.D. degree from the University of Nebraska College of Medicine in 1966. Thereafter he completed an internship at Lincoln General Hospital, Lincoln, Nebraska, in the years 1966 and 1967. Petitioner received his license to practice medicine in October 1966, from the State of Nebraska. 3 Petitioner entered into a residency program at the University of Nebraska Medical Center in July 1967 in *303 the area of obstetrics and gynecology. The program continued for a period of thirty-six months, terminating in the last week of June 1970. Petitioner was not a candidate for any degree while a resident at the University of Nebraska Medical Center. He did not receive credit hours from the University of Nebraska for any courses he took in the years 1968 and 1969.
The University of Nebraska Medical Center operates the University of Nebraska Hospital. The four major objectives of the hospital are patient care, teaching, research and community service. The hospital is a referral hospital, admitting patients referred to it by practicing physicians throughout Nebraska and the surrounding area. It also admits patients who might not have been referred by a physician.
The University of Nebraska Hospital has an obligation under state law to treat indigent patients. In fulfillment of this duty, the hospital has operated since 1966 a maternal and infant care project that is designed to provide medical services to people who have been identified as living in low income tracts in Omaha, Nebraska. The hospital charges of these patients are paid by a special project grant under social security *304 legislation. The State of Nebraska also pays part of the cost of this medical care. 4 Eighty to ninety percent of the obstetrical patients at the hospital are indigents, whose hospital expenses are paid by the Federal or state governments. These indigent patients are the primary responsibility of the residents with faculty consultation.
Publications of the Department of Obstetrics and Gynecology contain the following statistics for 1968 and 1969: 1968
1969 Obstetrical Service
Admissions
1,217
1,311
Deliveries
1,100
1,191
Medical Admissions
160
138
Obstetrical Surgical Procedures
810
905
Gynecology Service
Total Gynecologic Admissions
432
338
Major Surgical Procedures
174
151
Minor Surgical Procedures
304
174
Booth Hospital
Deliveries at Booth
167
115
Clinic Visits
1,462
430
Outpatient Services
Obstetric Clinic
9,176
8,956
Gynecology Clinic
4,477
3,859$1Family Planning
2,931
Total Outpatient Visits
16,149 5 Publications of the Department of Obstetrics and Gynecology also show the following breakdown for babies delivered in 1968 and 1969: DELIVERED By
1968
1969 Staff
62 (5.6%)
125 (10.6%)
Resident
555 (50.4%)
565 (47.8%)
Intern
120 (10.9%)
64 (5.3%)
Student
350 (31.8%)
416 (35.5%)
Nurse
13 (1.2%)
10 (0.8%)
*305 The obstetrics and gynecology residency program at the University of Nebraska Medical Center is closely affiliated with Immanuel, Methodist and Clarkson Hospitals in Omaha, Nebraska.Other affiliated hospitals are Kapiolani Hospital, Honolulu, Hawaii, the Offutt Air Force Base Hospital and Booth Memorial Hospital, both in or near Omaha. The University of Nebraska Hospital has an obligation to provide these hospitals with personnel to perform services in obstetrics and gynecology.
The services a resident in the Department of Obstetrics and Gynecology would perform for an obstetric patient would consist of diagnosis of the condition, antepartum care, participation in the delivery itself and postpartum care. The services a resident would render to a gynecologic patient would consist of outpatient diagnosis of illness or preventive medicine. If 6 a patient required a surgical procedure, the resident would be responsible for her inpatient care under supervision. The precise amount of care he would render would depend upon the level of his training and competence as determined by the responsible faculty member identified for that patient.
A resident's duties would include the following: *306 The recording of the history on each patient promptly after being admitted to the hospital; performing a physical examination of patients admitted to the hospital; writing a progress note at least weekly, and usually more frequently, on each patient's record; writing a transfer note when a patient is transferred to another specialty; obtaining a written consent for certain procedures; classifying patients as to the nature or severity of their illness; completing a death certificate, if necessary; completing the proper procedure in the event of an accident to a patient occurring within the hospital; dictating a case summary or discharge note promptly after discharge of the patient; and properly utilizing the service of consultants.
The duties performed by the petitioner were substantially similar to those performed by the other residents in the Department of Obstetrics and Gynecology. Because of his prior 7 experience in obstetrics and gynecology, petitioner was able to assume responsibility earlier than some of the other residents.
As he progressed through the term of his residency, petitioner was given more responsibility with patients. As a third year resident, petitioner was *307 also designated as an assistant instructor. Petitioner was chief resident in gynecology for a month period during 1969. A chief resident must be capable of performing most of the major surgical and obstetrical procedures. Although under the supervision of the faculty, the chief resident is given responsibility in decision making and teaching people under him. He is on call all the time, including every night and every weekend, so that any junior resident could contact him regarding any complicated case.
Although the petitioner was not required to work any specific hours per day or per week in his residency program, he was expected to be available when patients required care, including evenings and on Saturdays and Sundays. Petitioner frequently had to work at the hospital for periods of twenty-two to twenty-four hours. Petitioner was at the hospital every 8 Saturday from about 7:00 a.m. until at least noon and frequently after. He was required to be available for duty throughout the remainder of the day. On Sundays petitioner would make rounds in the mornings for two or three hours and then would be subject to call by the hospital.
Petitioner was frequently required to *308 be on twenty-four hour on-call duty at the hospital. When petitioner was on call at night, he was in the hospital to take care of any obstetrical patients who came in labor and were to be delivered. He also covered the emergency room for any gynecologic patients who had emergency problems or obstetrical patients who were having problems prenatally. He was responsible for the care of prenatal patients who were admitted to the hospital and who may have had problems that particular night.
In the year 1968, petitioner delivered about 280 babies. In the year 1969, petitioner delivered somewhere between 250 and 275 babies. During his residency, petitioner participated in approximately 100 major surgical procedures and 200 minor surgical procedures.
The rate of pay for residents was based strictly on experience, and did not take into account financial need. Petitioner 9 was paid $385.33 per month during his first year of residency, $550.00 per month during his second year and $575.00 per month during his third year.
In its statutory notice of deficiency, respondent allowed as an ordinary and necessary business expense deduction only part of the automobile expenses deducted by petitioner *309 in his return. These expenses related to cars that petitioner leased and owned during the years in issue and that he allegedly used in connection with his employment as a resident. Petitioner failed to produce any evidence relating to the extent to which he used these cars for business purposes during the years in issue.
OPINION
The issues for decision are (1) whether the petitioner is entitled to exclude certain stipends from his gross income for 1969 as a fellowship or scholarship grant under section 117 and (2) whether petitioner is entitled to deduct travel expenses in excess of those allowed by respondent for the taxable years 1968 and 1969.
Section 117 excludes from gross income any amount received as a scholarship or fellowship grant. For individuals who are not candidates for a degree, such exclusion is limited to $300 10 per month for each month during the taxable year that the recipient received amounts under the scholarship or fellowship grant. Section 1.117-4(c) of the Income Tax Regs., provides that the following payments or allowances shall not be considered to be amounts received as scholarship or fellowship grants for the purpose of section 117:
(c) Amounts *310 paid as compensation for services or primarily for the benefit of the grantor. (1) Except as provided in paragraph (a) of § 1.117-2, any amount paid or allowed to, or on behalf of, an individual to enable him to pursue studies or research, if such amount represents either compensation for past, present, or future employment services or represents payment for services which are subject to the direction or supervision of the grantor.
(2) Any amount paid or allowed to, or on behalf of, an individual to enable him to pursue studies or research primarily for the benefit of the grantor.
However, amounts paid or allowed to, or on behalf of, an individual to enable him to pursue studies or research are considered to be amounts received as a scholarship or fellowship grant for the purpose of section 117 if the primary purpose of the studies or research is to further the education and training of the recipient in his individual capacity and the amount provided by the grantor for such purpose does not represent compensation or payment for the services described in subparagraph (1) of this paragraph. * * *
The validity of these regulations has been upheld by the Supreme Court of the United *311 States. Bingler v. Johnson, 394 U.S. 741 (1969). 11 We find that the payments to petitioner represented compensation for present services that were subject to the direction or supervision of the grantor. As a resident in obstetrics and gynecology, petitioner rendered services to the hospital that were both extensive and valuable. Petitioner was responsible for diagnosis of patients' conditions, maintaining patient records, participation in deliveries, performing physical examinations and other duties. He also instructed medical students and for a month was chief resident, which position required decision making and that he be on call at all times. In carrying out these duties, however, petitioner acted under the direct or indirect supervision of the hospital staff. See Frederick Fisher, 56 T.C. 1201 (1971) and Aloysius J. Proskey, 51 T.C. 918 (1969).
Petitioner's contribution to the performance of the hospital's objective of patient care was by no means an "incidental benefit" to the grantor. Petitioner delivered about 280 babies in 1968 and about 250 babies in 1969. During his residency, petitioner participated in approximately 100 *312 major surgical procedures and 200 minor surgical procedures.
The rates of payment received by the residents provide further evidence that the hospital was compensating its residents for services rather than making disinterested payments 12 in order to further the education of the residents. The payments to the residents were not based on financial need but rather were dependent only on the length of service of the resident.
Petitioner argues that the primary purpose of the University of Nebraska Hospital is the training of physicians rather than the treatment of patients and that therefore the primary purpose of the payments was to further his education and training. We conclude that the record does not support petitioner's allegation. The only evidence offered to support this allegation was petitioner's own statement to that effect. We find this testimony unconvincing in view of the statistics regarding the numbers of deliveries, surgical procedures, etc., performed by the department during 1968 and 1969. By performing these substantial services for patients, most of whom were indigents, the hospital was fulfilling the responsibility of the State of Nebraska to provide hospital *313 care for its indigents.
Even if we were to find that the primary purpose of the hospital was teaching, we would nevertheless conclude that the payments in issue were compensation. The test provided in the regulations refers to the primary purpose of the payment made to the taxpayer rather than the primary purpose of the hospital facility. See Hembree, Jr. v. United States, 464 F.2d 1262 (C.A. 4, 1972). 13 The petitioner further argues that he did not replace any doctor during the period of his residency. A professor at the hospital testified that the permanent faculty and part-time physicians could have handled the deliveries that took place at the hospital. The witness did not state, however, whether the permanent staff could have performed the other services, including teaching, available at the hospital. We do not find this testimony convincing. Furthermore, for the same reasons set forth in Frederick Fisher, 56 T.C. 1201 (1971), we do not believe that residents' salaries are noncompensatory merely because the hospital could "operate" without them.
Petitioner relies on Leathers v. United States, 471 F.2d 856 (C.A. 8, 1972), in *314 which the Court of Appeals affirmed a district court decision that payments to resident doctors were excludible from income. The Court of Appeals affirmed on the ground that the question of the primary purpose of the payment was one of fact and properly submitted to the jury, which had found that the purpose was furthering the taxpayer's education. We have made a contrary finding in the present case. 14 The second issue for decision is whether petitioner is entitled to deduct travel expenses in excess of those allowed by respondent. The only evidence presented by petitioner in his behalf was his own self-serving, uncorroborated statement. He failed to produce any evidence to substantiate his claim that the deduction for travel expenses allowed by respondent was incorrect. We therefore hold that petitioner has failed to meet his burden of proof and that the travel expenses in excess of those allowed by respondent are not deductible.
Decision will be entered for the respondent. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as in effect during the years in issue, unless otherwise indicated.↩