**Jerome BURSTEIN and Rochelle Burstein**

v.

**The UNITED STATES.**

**No. 402–76.**

United States Court of Claims.

May 14, 1980.

Thomas Smidt, II, Albuquerque, N. M., attorney of record, for plaintiff; Smidt & Tucker, P. C., Albuquerque, N. M., of counsel.

William C. Rapp, Washington, D. C., with whom was Asst. Atty. Gen. M. Carr Ferguson, Washington, D. C., for defendant; Theodore D. Peyser, Washington, D. C., of counsel.

Before KASHIWA, KUNZIG and BENNETT, Judges.

OPINION

KASHIWA, Judge:

This case is before us on defendant's requested review of the report of Trial Judge David Schwartz, which found that the plaintiffs are entitled to an exclusion under I.R.C. § 117[1] for fellowship amounts received while in medical residency programs during 1973. For reasons which will be discussed below, after consideration of the briefs and oral argument, we reject the recommended decision and hold for defendant.

The plaintiffs, Dr. Rochelle Burstein (Rochelle) and Dr. Jerome Burstein (Jerome), were medical residents in pediatrics

---

1. At issue in this case is section 117 of the Internal Revenue Code of 1954. Since plaintiffs are not degree candidates, the extent of the exclusion is limited by section 117(b)(2). Section 117 states in pertinent part:

"SEC. 117. Scholarships and fellowship grants.

"(a) *General Rule.*—In the case of an individual, gross income does not include—

"(1) any amount received—

"(A) as a scholarship at an educational institution (as defined in section 151(e)(4)), or

"(B) as a fellowship grant, including the value of contributed services and accommodations; and

"(2) any amount received to cover expenses for—

"(A) travel,

"(B) research,

"(C) clerical help, or

"(D) equipment,

which are incident to such a scholarship or to a fellowship grant, but only to the extent that the amount is so expended by the recipient.

"(b) *Limitations.*—

\* \* \* \* \* \*

"(2) *Individuals who are not candidates for degrees.*—In the case of an individual who is not a candidate for a degree at an educational institution (as defined in section 151(e)(4)), subsection (a) shall apply only if the condition in subparagraph (A) is satisfied and then only within the limitations provided in subparagraph (B).

"(A) *Conditions for exclusion.*—The grantor of the scholarship or fellowship grant is—

"(i) an organization described in section 501(c)(3) which is exempt from tax under section 501(a),

"(ii) a foreign government,

"(iii) an international organization, or a binational or multinational educational and cultural foundation or commission created or continued pursuant to the Mutual Educational and Cultural Exchange Act of 1961, or

"(iv) the United States, or an instrumentality or agency thereof, or a State, a territory, or a possession of the United States, or any political subdivision thereof, or the District of Columbia.

"(B) *Extent of exclusion.*—The amount of the scholarship or fellowship grant excluded under subsection (a)(1) in any taxable year shall be limited to an amount equal to $300 times the number of months for which the recipient received amounts under the scholarship or fellowship grant during such taxable year, except that no exclusion shall be allowed under subsection (a) after the recipient has been entitled to exclude under this section for a period of 36 months (whether or not consecutive) amounts received as a scholarship or fellowship grant while not a candidate for a degree at an educational institution (as defined in section 151(e)(4))."

and radiology, respectively, at the University of New Mexico. This case is unique because contracts executed by the plaintiffs and the University provided that $300 a month paid by the University to each plaintiff was "a fellowship grant for training and education within the meaning of section 117 * * *."[2] Plaintiffs sought to exclude from income such amounts received during 1973. The Internal Revenue Service denied the applicability of section 117 to the above payments. Plaintiffs paid the contested amount and sought a refund in this court. Trial was held and the report recommended that the section 117 exclusion be allowed. Additionally, plaintiffs sought refund of FICA taxes withheld on the asserted fellowship payments, which also was allowed in the trial judge's report.

The contracts provided that the duties of the plaintiffs included both "services" and "educational" activities.

Clause "C.1" typically describes the services as:

1. *Services*: Act as house staff physician for patients at the hospital to be selected by Hospital physicians. Either the Program Director or a patient's attending physician may delineate the degree of responsibility expected of each House Staff member for each patient. The House Staff member will complete and dictate history, physical, impressions, and recommendations upon admission of patients and will write admitting and follow-up orders, make daily rounds, and check for the completeness of charts upon patient's discharge; however, except in emergency situations, House Staff members will consult with a patient's attending physician before initiating diagnostic or therapeutic measures. House Staff members will perform other duties as di-

rected from time to time by the Program Director.

Clause "C.2" typically describes, in pertinent part, the educational activities as:

2. *Educational Activities*: Actively participate in the teaching programs and educational activities for his individual educational advancement, under the guidance and direction of the Program Director and Chief of the Service to which he is assigned. * * *

Clause "C.6" provides the guidelines to which the plaintiffs were to conform their conduct while acting as residents, in both their "services" and "educational" activities:

6. *Rules and Policies*: Comply with all Rules and Regulations governing House Staff members *and all personnel policies currently in effect for hospital employees* in Bernalillo County Medical Center and in all affiliated hospitals, clinics and activities. [Emphasis supplied.]

Clause "D.2" provides, in pertinent part, the rights of the grantor in terminating the activities of the plaintiffs:

2. Unsatisfactory performance by the member of the House Staff either in participation in the teaching programs or in those services performed as House Staff physician under the supervision of hospital physicians, is cause for termination of the Contract for Service, Fellowship, or both, in the discretion of the House Staff member's Chief of Service and Program Director. * * *

The residency programs of the plaintiffs were typically as follows.

### Dr. Rochelle Burstein

Rochelle was a medical school graduate and was capable of being licensed to prac-

---

2. The following clause is typical:

"A. FELLOWSHIP AND STIPEND.

"1. The House Staff member will receive a fellowship grant in the sum of $300.00 monthly during the fiscal year 1973 to 1974, not to exceed $3,600.00 in the aggregate. The University considers such amount a fellowship grant for training and education within the meaning of Section 117 of the Internal Revenue Code.

"2. For services to be rendered the House Staff member will receive a stipend of $483.33 monthly during the fiscal year 1973 to 1974, not to exceed $2,900.00 in the aggregate, whether paid by BCMC, the VA hospital, or Carrie Tingley Hospital. * * *"

tice medicine in New Mexico. She spent approximately 7 to 10 hours per week attending lectures. The remainder was spent on clinical[3] activities. As a pediatric resident, she generally spent her time in the pediatric ward, the pediatric outpatient clinic, and the newborn nursery and intensive care unit. Rochelle was always responsible to an attending physician who was ultimately responsible for the care of the particular patient, although the necessity for a consultation with the attending physician was to a large degree at her discretion.

Rochelle had the least responsibility in the intensive care unit (although she did histories and gave physical examinations) and had a large degree of responsibility on the ward and in the outpatient clinic, where responsibility for actual patient care largely rested on the residents in charge.

The residents on the ward varied as to tenure and they operated as a team in providing the patient care; however, an attending physician was on call at all times. While on the pediatric ward, Rochelle gave physical examinations both prior to admission and discharge, wrote admitting orders, and prescribed drugs and courses of treatment.

In the outpatient clinic, Rochelle provided some treatments without consultation with the attending physician. She also provided the initial evaluation of the patient's condition, ordered laboratory studies, and arranged for appropriate care and follow-up. During non-regular hours and on weekends and holidays, only residents and interns were present at the clinic. An attending physician was on call but it was the resident in charge of the clinic who decided the necessity of a consultation with the attending physician.

### Dr. Jerome Burstein

Jerome was licensed to practice medicine in California and was capable of being licensed to practice in New Mexico. He spent approximately 8 to 10 hours per week in traditional classroom education. As a radiology resident, Jerome had two primary clinical occupations: (1) viewing radiographs and (2) participating in special procedures.

In viewing radiographs, Jerome would examine an X-ray photograph, decide whether an abnormality existed, and if so, its nature and extent. In a nonemergency case, these findings were reviewed and discussed by a member of the staff. After such a discussion, Jerome would dictate a report and sign the transcription. The staff radiologist rendered the report official with his initial.

While on call or on weekends, in reviewing a radiograph taken for an emergency room case Jerome at times orally gave his opinion to the emergency room doctor, prior to review by an attending radiologist. At Jerome's discretion, in cases such as fractures and pneumonia, he would give his opinion to the clinician without review. All emergency room films were reviewed, however, each morning by a staff radiologist who would correct any errors.

The special procedure phase of the clinical activities involved the use of radioactive or radiopaque substances which were either ingested by or injected into a patient prior to the taking of a radiograph. Jerome's involvement ranged from passive observation to actual physical involvement—giving the injection, making the incision, etc.

■ The trial judge found that the plaintiffs were entitled to exclude from income that portion of their residency stipend denominated under the contract as the "fellowship" grant. The reason for his decision is as follows:

> The present case differs from earlier cases in the clarity of the evidence here showing (1) that separate payments were made as fellowship grants and as salary for patient care service; (2) that the hospitals involved had concurrent purposes of patient care and medical education and

---

3. "Clinical" activities refer to plaintiffs' nondidactic activities, such as those related to the diagnosis, care, and treatment (and the observation thereof) of patients, as such activities normally occur in the particular specialty.

that the intention of all—University, hospital and resident—in making the payment claimed to be a nontaxable grant was educational;[4] (3) that a definite part of the activities of the resident was entirely educational and another such part was both educational and a service to hospital patients; and (4) that a division is possible between the number of hours spent in education and services to patients. From these circumstances it becomes possible to assess whether the time spent in purely educational activities warrants a conclusion that the $300.00 monthly purportedly paid as a fellowship grant for education was in fact paid to promote the education of the Plaintiffs, and not as compensation for services to the hospital, as required for an exclusion from income.

The gist of the trial judge's reasoning can be summarized as follows: separate payments were made for services and educational activities; the activities of the plaintiffs can be segregated into either education or services; the *quid pro quo* elements of the arrangement are limited solely to the service activities and, thus, the amounts labeled as fellowship payments are, in fact, payments to aid the study or training of the plaintiffs.

The key finding of the trial judge is that a division is possible between educational activities and compensable service activities. From this division flows the finding that any service-connected activities, duties or remuneration redound to the "separate" compensation payments, and the amount remaining (i. e., $300 per month) is readily identifiable and limited to the noncompensable educational activities, and because of the termination clause no *quid* of services is required to receive this $300 per month. This is highlighted in the report by the finding of a direct correspondence between the medical residency programs at issue and a college program providing a cash scholarship to enable a student to attend his classes and also employ him, for wages, to work in, e. g., the college dining hall.

In order for plaintiffs to prevail, it must be established that the amounts characterized under the contract as "fellowship" grants were in fact fellowship grants within the meaning of section 117. Section 117 does not define what is a fellowship grant. However, the regulations under section 117 do.[5]

The Supreme Court upheld the validity of Treas.Reg. § 1.117–4(c) in *Bingler v. John-*

---

**4.** In determining the excludability of the stipend, we must examine the purpose of the *grant.* We are not controlled by the purpose of the hospital (i. e., whether the hospital's primary purpose is teaching or patient care). *Hembree v. United States,* 464 F.2d 1262, 1264 (4th Cir. 1972).

**5.** Treas.Reg. § 1.117–4(c) provides in part:

"§ 1.117–4 *Items not considered as scholarships or fellowship grants.*

"The following payments or allowances shall *not* be considered to be amounts received as a scholarship or a fellowship grant for the purpose of section 117: [Emphasis supplied.]

\* \* \* \* \* \*

"(c) *Amounts paid as compensation for services or primarily for the benefit of the grantor.* (1) Except as provided in paragraph (a) of § 1.117–2, any amount paid or allowed to, or on behalf of, an individual to enable him to pursue studies or research, if such amount represents either compensation for past, present, or future employment services or represents payment for services which are subject to the direction or supervision of the grantor.

"(2) Any amount paid or allowed to, or on behalf of, an individual to enable him to pursue studies or research primarily for the benefit of the grantor.

However, amounts paid or allowed to, or on behalf of, an individual to enable him to pursue studies or research are considered to be amounts received as a scholarship or fellowship grant for the purpose of section 117 if the primary purpose of the studies or research is to further the education and training of the recipient in his individual capacity and the amount provided by the grantor for such purpose does not represent compensation or payment for the services described in subparagraph (1) or this paragraph. Neither the fact that the recipient is required to furnish reports of his progress to the grantor, nor the fact that the results of his studies or research may be of some incidental benefit to the grantor shall, of itself be considered to destroy the essential character of such amount as a scholarship or fellowship grant."

*See generally Bingler v. Johnson,* 394 U.S. 741, 758 n.32, 89 S.Ct. 1439, 1449 n.32, 22 L.Ed.2d 695 (1969).

son, *supra* note 5. In that regard, the Tax Court had earlier ruled that before a payment may be excluded under section 117, "there must be a determination that the payment sought to be excluded has the normal characteristics associated with the term 'scholarship.'" *Reese v. Commissioner*, 45 T.C. 407, 413 (1966), *aff'd per curiam*, 373 F.2d 742 (4th Cir. 1967). The Supreme Court agreed with *Reese* and held, with regard to Treas.Reg. § 1.117–4(c):

> * * * Here, the definitions supplied by the Regulation clearly are prima facie proper, comporting as they do with the ordinary understanding of "scholarships" and "fellowships" as relatively disinterested, "no-strings" educational grants, with no requirement of any substantial *quid pro quo* from the recipients. [394 U.S. at 751, 89 S.Ct. at 1445.]

■ The regulations direct us to look to the purpose of the payment. Relying on the regulations and the instruction of the Supreme Court, we must determine whether the $300 monthly payments are "relatively disinterested, 'no-strings'" payments. To be excludable, the primary purpose of the payment must be a relatively disinterested stipend to further the education and training of the recipient. If, on the other hand, the primary purpose is to compensate or reward the recipient for any past, present or future services or as an inducement to the above, no exclusion will be allowed under section 117. *Parr v. United States*, 469 F.2d 1156 (5th Cir. 1972); *Fisher v. Commissioner*, 56 T.C. 1201 (1971). In other words, was the payment made as a substantial *quid pro quo*: that is, was the *quo* of payment made in return for the *quid* of either past, present or future services to be performed by the recipient.

Since *Bingler v. Johnson*, the almost overwhelming trend in the courts has been to deny a section 117 exclusion for payments made to medical residents. *See, e. g., Parr v. United States, supra; Wertzberger v. United States*, 315 F.Supp. 34 (W.D.Mo. 1970), *aff'd per curiam*, 441 F.2d 1166 (8th Cir. 1971); *Naman v. Commissioner*, 33 T.C.M. 681 (1974); *Dietrich v. Commission-*

*er*, 33 T.C.M. 66 (1974), *aff'd per curiam*, 503 F.2d 1379 (8th Cir. 1974), and many others. *But see Leathers v. United States*, 471 F.2d 856 (8th Cir. 1972), *cert. denied*, 412 U.S. 932, 93 S.Ct. 2754, 37 L.Ed.2d 161 (1973); *Bieberdorf v. Commissioner*, 60 T.C. 114 (1973). Cases have specifically denied section 117 treatment for pediatric and radiology residents. *E. g., Hales v. Commissioner*, 37 T.C.M. 946 (1978) (pediatric resident); *Homer v. Commissioner*, 36 T.C.M. 283 (1977) (radiology resident).

Generally, a major reason why such residency programs have been found unqualified for section 117(a)(1)(B) treatment is that the educational portion is inextricably intertwined with the service portion. In their essentials, the programs consist of affording a, generally, young physician the opportunity to add to his knowledge and develop an expertise in a field of medicine by participating in clinical activities, complemented by some didactic training, providing essential learning experiences yet also of compensable value to the institution. As a result, under *Bingler v. Johnson* the payments received by the resident for such activities have been deemed more properly characterized as compensation for services and not as disinterested fellowship grants. What the Tax Court said in *Proskey v. Commissioner*, 51 T.C. 918, 925 (1969), is equally applicable to our facts:

> * * * There can be no serious doubt that work as a resident physician provides highly valuable training, particularly in preparing for specialties in the various fields of medicine. Yet virtually all work as an apprentice, whether in medicine or law, carpentry or masonry, provides valuable training. Nothing in section 117 requires that an amount paid as compensation for services rendered be treated as a nontaxable fellowship grant, merely because the recipient is learning a trade, business, or profession. * * *

The trial judge in the instant case found no such difficulty because of his belief that "'[c]linical' work prescribed by educational authorities, for an education purpose, which is superfluous to the care of patients by

reason of its duplication by attending senior physicians, is without significance in respect of patient care, at least for present purposes of determination of compensable services." Apparently relying on this "definition" of compensable services, the trial judge found that the clinical activities of both plaintiffs were, preponderantly, spent on educational and not compensable activities. Since the "$300 payment" was less than half of the total amount received, the allocated amount was not a *quo* in return for the *quid* of services; rather, the *quo* of payment for services was limited to the *quid* of *service* activities and was insulated from the educational activities by the contractual allocation and the termination clause of the contract. Also, notwithstanding the tax motivation of these arrangements, the trial judge recommended, based on *Helvering v. Gregory*, 69 F.2d 809, 810 (2d Cir. 1934), that this "dual method" be respected.

 The trial judge's analysis and conclusion are erroneous on several grounds. The clinical activities of these residents are not divisible (approximately 80 percent of both plaintiffs' programs involved clinical activities). The fact that a certifying board requires activities to be performed,[6] and that those activities are closely supervised or even duplicated at a higher level, does not necessarily render those activities of noncompensable value to the institution.[7] The trial judge may have excluded activities which are not *necessary* for the operation of that institution but he also, errone-

ously excluded activities which are of *value* to the hospital.[8] The proper field of inquiry is whether the activities are of value to the hospital. *Weinberg v. Commissioner*, 64 T.C. 771 (1975); *Fisher v. Commissioner*, *supra*.

We agree with *Fisher v. Commissioner*, 56 T.C. at 1215:

At the trial herein, the medical director of the Center testified that the Center "probably could operate [without residents] without increasing its staff" by having its staff members care for patients during periods previously spent teaching residents. We do not find that testimony convincing. The services performed by residents at the Center were extensive. * * * More fundamentally, even if the Center *could* do without residents, it did not do without them; it used their services, and it paid for them. Many employees may be dispensable in the sense that their employers could "operate" without them. But such dispensability hardly renders their salaries noncompensatory.

Additionally, the supervision and control of the activities of these residents are not uncharacteristic of compensable services.[9] Most employees are subject to control over their work product and the fact that, for example, a recommended solution to a problem is countermanded or refined by an employee's supervisor does not render the employee's contribution valueless to the employer. In fact, such close supervision can increase the value of the services to the

---

6. For a residency program to be accredited, it must provide for increasing amounts of independent decision making on the part of the resident involved.

7. The contracts themselves contemplate compensable services by plaintiffs involving review by an attending physician. Clause "C.1," in describing the services to be performed, provides that the plaintiffs usually must consult with the patient's attending physician before initiating diagnostic or therapeutic measures. Also, this clause indicates services will be considered compensable even though the responsibility of the resident involved varies according to the discretion of the patient's attending physician. This language is broad enough to encompass activities ranging from the slightest

degree of authority to personal autonomy, after consultation with the particular attending physician.

8. Due to the presence of the residents, the attending physicians were generally relieved from nighttime and weekend duties. It is likely that the attending physicians would not find the hospitals as attractive a place to work if they were forced to cover these previously off hours and days.

9. Treas.Reg. § 1.117–4(c)(1) provides that payments for services subject to the supervision or direction of the grantor are not fellowship grants.

employer. *See Weinberg v. Commissioner,* 64 T.C. at 779; *Fisher v. Commissioner,* 56 T.C. at 1212; *Turem v. Commissioner,* 54 T.C. 1494, 1505 (1970).

 Therefore, after reviewing the clinical activities of the plaintiffs, we do not believe their clinical activities are capable of being severed into two distinct activities. Nor are we persuaded that the contracts alter this. The contracts attempt to bifurcate the residency programs for tax purposes by three major clauses. First, a proviso is made for separate payments (often by a single check), one for services rendered and the other for aid in education and training of the plaintiffs. Second, the contracts attempt to separately prescribe service activities and education activities. Third, the contracts provide for termination from either or both of the service or educational activities if the plaintiffs' performance is substandard.

 At the outset we note that in considering these contracts we must look to the substance of the transaction; the true nature of the arrangement cannot be altered by mere contractual formalisms. *Commissioner v. Court Holding Co.,* 324 U.S. 331, 334, 65 S.Ct. 707, 708, 89 L.Ed. 981 (1945). We agree that it is legally permissible for a taxpayer to decrease or avoid taxation using methods which the law permits. However, here "the question for determination is whether what was done, apart from tax motive, was the thing which the statute [section 117] intended." *Gregory v. Helvering,* 293 U.S. 465, 469, 55 S.Ct. 266, 267, 79 L.Ed. 596 (1935), *aff'g* 69 F.2d 809 (2d Cir. 1934). A purpose of section 117 is to avoid the exclusion of money received as compensation for services but labeled as a "scholarship" or "fellowship."

We find the first two clauses of the contracts, outlined above, do not prevent the residency programs from being considered as one inseparable activity. No study was ever conducted by the grantor gauging whether the contractual allocation between service compensation and the "fellowship" grant was anything but a mere formalism attempting to produce the desired tax consequences. In a similar vein, we note that this allocation benefited the grantor because, e. g., no social security taxes had to be paid on any excludable portion. Also, the contractual separation of service activities from educational activities describes them in only the most general terms and, as such, no distinction between those activities (on the clinical level) can be made based on the contract.

The thrust of the argument relating to the termination clause (*see* pp. 532–533 *supra*) is that in operation the residency programs are divisible because a failure by plaintiffs to adequately perform the services for which they are obliged does not necessarily jeopardize the availability of the "fellowship" grant. Hence, the *quid pro quo* elements are removed from the educational activities portion.

On its face the termination clause gives the Chief of Service and Program Director the discretionary authority to terminate a resident's activities in either the service or educational activities, or both. But we are not convinced this clause has any substance to it. The contracts do not isolate which clinical activities are deemed educational and which are deemed service. Clinical activities are required by the particular boards in order for a resident to become "board certified" in his particular specialty. It is difficult to believe a resident could be found to lack sufficient intellectual or moral capacity to stay in the educational program yet stay on with the hospital to perform the services dictated and freely interact with the patients, with responsibility for life and death decision making (e. g., in an emergency situation). Or that the resident could be felt to be unqualified to perform the clinical services for the hospitals yet still be allowed to remain on in an educational capacity, where the certifying boards require independent decision making with regard to such clinical activities. In short because these clinical activities are not capable of severance, and since such clinical activities provide valuable services to the institutions and are also a part of the educational process, plaintiffs have failed to

prove how a resident could be dismissed from such a clinical role and remain to receive his specialty education. Further, upon questioning at oral argument plaintiffs' counsel acknowledged he was unaware of any instance where the termination clause had been invoked.

In light of the above, we hold that the contracts do not allow the residency programs to be bifurcated into one segment of compensable services and another of educational activities, with no *quid pro quo* required in order to receive the "fellowship" amount.

■ In characterization the payments more closely resemble compensation than a fellowship. The amounts received were not based on academic standing or financial need. A payment based on financial need has been called a "hallmark" of a fellowship grant. *Towns v. Commissioner*, 33 T.C.M. 632 (1974). Also, the payments are increased solely as a matter of tenure (tied into pay increases of state employees). This is another feature common to compensation in that pay is increased as the employee becomes of greater value to the employer.

Plaintiffs also received various perquisites such as paid annual vacations, sick leave, free meals if they had to work overnight, white coats (and laundry thereof), medical insurance, free medical care and medical malpractice insurance. Because of our discussion above, it was erroneous for the trial judge to attribute these perquisites solely to his defined and segregated compensable service activities. They must be attributed to the entire program. These are benefits which are usually associated with an employment relationship. The presence of similar perquisites has been an important consideration in other cases, *e. g., Woddail v. Commissioner*, 321 F.2d 721 (10th Cir. 1963), aff'g 21 T.C.M. 1248 (1962); *Hamacher v. Commissioner*, 33 T.C.M. 529 (1974); *Anderson v. Commissioner*, 54 T.C. 1547 (1970), and we are in accord with those cases and find on our facts that the presence of the perquisites is an important indicator of the nature of the stipend. *Cf.*

*Steiman v. Commissioner*, 56 T.C. 1350, 1356 (1971) (graduate assistants studying for doctoral degrees were allowed a section 117 exclusion with the court placing weight on the absence of any perquisites). We also emphasize that the plaintiffs maintained regular hours and were not free to come and go at their will. Also, under the contracts the plaintiffs were subject to all personnel policies in effect for hospital employees (*see* p. 532 *supra* ).

■ Therefore, after an examination of these residency programs, and under a proper standard of what constitutes compensable services, we hold that the clinical portions of these particular residency programs are not capable of division into education and services. They must be considered as a whole to determine whether there exists any substantial requirement for the performance of services in order to receive the stipend. Since both residency programs did require substantial, valuable services to be performed in order for the plaintiffs to be trained in their fields of medicine, any payment for such activities must be considered compensation. Further, since such services had to be rendered in order to receive the so-called "dual" payments, both "portions" result in taxable income.

■ We do not establish a *per se* rule with respect to medical residency programs but we do find that these residency programs are not severable and all payments must be viewed as a stipend for plaintiff's activities. Since we hold there was a substantial *quid pro quo* required for the plaintiffs to receive their stipends, no amount may fairly be characterized as a "fellowship" grant within the ordinary understanding of that phrase, as interpreted by the standard set forth in *Bingler v. Johnson*. Accordingly, we conclude that the trial judge erred in allowing a section 117 exclusion for the plaintiffs; the amount labeled a "fellowship" grant in the contracts is in reality compensation. Since we hold no amount is excludable, we need not reach the issue of sufficiency of the pleading for the FICA tax refund, as no such refund is allowed.

## CONCLUSION OF LAW

We hold that the trial judge's report is erroneous and is therefore reversed. No exclusion under section 117 is allowed, no FICA tax refund is allowed, and the petition is dismissed.